11 CV 0606

Todd E. Soloway: tsoloway@pryorcashman.com
Eric D. Sherman: esherman@pryorcashman.com
Joshua D. Bernstein: jdbernstein@pryorcashman.com
Eric D. Dowell: edowell@pryorcashman.com
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
JAN 26 2011
U.S.D.C. S.D. N.Y.
Civil COMPLETED

LLEWELLYN CONNOLLY, DODGAR PARTNERS LTD.,
EDWARD RAZEK, OCEAN VILLA 4 (D.C.) LTD., THOMAS
WALKER III, BEACH VILLA V. D.C. LTD., ANDREY
IVANOV-GALITSYN, VILLA 7 DELLIS CAY LTD.,
ESTEFANO ISAIAS, SALINAS ON THE BEACH LTD.,
STÉPHANE AND SANDRINE PICTET, THOMAS SINGH,
UPWEY LTD.,MICHAEL TOPR, OCEAN VILLA 2 (D.C.)
LTD., MIKAL AND TAMMY WATTS, and 313TW
CARRIBEAN INVESTMENTS LTD.,

           Plaintiffs,

   - against -

CEM KINAY, OGUZ SERIM, O PROPERTY COLLECTION
USA, INC., O PROPERTY COLLECTION GMBH, O
PROPERTY COLLECTION TCI LTD., TURKS
DEVELOPMENT L.P., TURKS GENERAL PARTNERS
LTD., TURKS (B.V.I.) HOLDINGS LTD., TURKS LTD.,
DELLIS CONSTRUCTION LTD., WILLIAM TACON AS
RECEIVER OF TURKS DEVELOPMENT L.P. AND TURKS
LTD., STEPHEN KATZ AS PROVISIONAL LIQUIDATOR
OF DELLIS CONSTRUCTION LTD., MARJORIE KINAY,
CENK KINAY, THE SUU HOTELS, TRINIDAD AND
TOBAGO UNIT TRUST CORPORATION, MANDARIN
ORIENTAL HOTEL GROUP INTERNATIONAL LTD.,
MANDARIN ORIENTAL MANAGEMENT (BVI) LTD.,
MER INSAAT, HALIS SUMER, and AVATAR REAL
ESTATE SERVICES, LLC,

           Defendants.

**COMPLAINT**


**Jury Trial Demanded**

Plaintiffs Llewellyn Connolly, Dodgar Partners Ltd., Edward Razek, Ocean Villa 4 (D.C.) Ltd., Thomas Walker III, Beach Villa V. D.C. Ltd., Andrey Ivanov-Galitsyn, Villa 7 Dellis Cay Ltd., Estefano Isaias, Salinas on the Beach Ltd., Stéphane and Sandrine Pictet, Thomas Singh, Upwey Ltd., Michael Topr, Ocean Villa 2 (D.C.) Ltd., Mikal and Tammy Watts, and 313TW Caribbean Investment Ltd. (collectively, "Plaintiffs" or "Purchasers"), by their attorneys Pryor Cashman LLP, as and for their Complaint against defendants Cem Kinay, Oguz Serim, O Property Collection USA, Inc., O Property Collection GmbH, O Property Collection TCI Ltd., Turks Development L.P., Turks General Partners Ltd., Turks (B.V.I) Holdings Ltd., Turks Ltd., Dellis Construction Ltd., William Tacon as Receiver of Turks Development L.P. and Turks Ltd., Stephen Katz as Provisional Liquidator of Dellis Construction Ltd., Marjorie Kinay, Cenk Kinay, The SUU Hotels, Trinidad and Tobago Unit Trust Corporation, Mandarin Oriental Hotel Group International Ltd., Mandarin Oriental Management (BVI) Ltd., Mer Insaat, Halis Sumer and Avatar Real Estate Services, LLC (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

### The Fraud in Brief

1.     This action relates to a massive fraud that was perpetrated against Plaintiffs in connection with the marketing, financing and development of a promised luxury mixed-use property on the island of Dellis Cay, located in the Turks and Caicos Islands (the "Project").

2.     The principal and driving force behind the Project and the associated scam accomplished through a web of alter-ego entities was defendant Cem Kinay ("Kinay"), an Austrian and United States national with a history of questionable business practices and associations. Kinay's partner in the fraud was defendant Oguz Serim ("Serim").

3.     The scheme was simple: induce Purchasers to pay over $50 million to purchase lots and to have homes ("Villas") developed on those lots; falsely proclaim that Kinay and his alter-ego entities had obtained sufficient construction financing to complete the project—when they secretly knew that they had no such financing; obtain the lending institution's cooperation in fraudulently inducing Purchasers to continue to make installment payments towards the development of their respective Villas (because it was in both the lender's and Kinay's interest for Purchasers to continue to make payments); make specific misrepresentations as to the status and schedule of development to insure that Purchasers' money kept flowing; use Purchasers' monies and what money they could siphon from the bank loan to lavish themselves with worldly material possessions including multimillion dollar homes, private planes and to (literally) bribe public officials in connection with attempts to expand the Project; and when they finished extracting as much money as they could—walk away from the Project.

**The Scheme**

4.     Kinay and Serim purchased Dellis Cay in 2005 through their alter-ego entity, defendant Turks Ltd. ("Turks"). They then marketed the Project—which was to include a five-star hotel (the "Hotel") and related facilities, condominium units ("Residences") and private residences, including the Villas that Plaintiffs purchased—to wealthy people as a one-of-a-kind opportunity that would feature the utmost in luxury and exclusivity.

5.     Kinay and Serim fraudulently induced Plaintiffs, their victims, to spend millions of dollars on the purchase of land parcels. Then, with the assistance of a prominent lender (defendant Trinidad and Tobago Unit Trust Corporation—"TTUTC"), the fraudsters embarked on a calculated scheme to extract millions more from Purchasers by inducing them to make subsequent installment payments for the development and delivery of fully constructed Villas.

6.      As Purchasers continued to pour money into the Project, Kinay and TTUTC knew that they lacked sufficient funds to complete the Project and that it ultimately would fail.

7.      TTUTC nevertheless continued to lend its name, prestige and affirmative misrepresentations to a transaction that was doomed for the sole purpose of protecting its own so-called "loan," all at the actual expense of each Plaintiff.

8.      At the same time, Kinay called upon his shell/alter-ego entities for the purpose of diverting money to himself and his partner—treating the Project as their personal piggy bank and siphoning tens of millions from Project coffers into their own pockets.

9.      Rather than use the funds to construct the Project, Kinay and Serim instead spent Purchasers' money on, among other things, an $8 million Miami Beach home, bribes to government officials, unrelated real estate ventures, payments to related entities without consideration and globe-trotting on private planes.

10.     Upon information and belief, of the nearly $100 million that the Project took in from sales, less than a third was spent on construction. And of the approximately $75 million in villa purchaser funds that went into the Project (over $50 million of which came from Plaintiffs), less than $7 million was spent on constructing the Villas. The balance was stolen.

11.     Kinay and Serim's early efforts to draw Purchasers in included enlisting defendant Mandarin Oriental Hotel Group International Ltd. and its affiliate defendant Mandarin Oriental Management (BVI) Ltd. (collectively, "Mandarin Oriental" or "Mandarin") to manage the Hotel and lend its reputation as a leading global brand to the Project. Mandarin in turn licensed Kinay to use its valuable name and logo on his correspondence and promotional materials, and continued to authorize such use even as it knew that the Project was failing.

12.     Kinay also misrepresented that he had retained a prominent international contractor (ENKA) to oversee construction for the Project. This representation was nefariously designed to assure Purchasers that construction would be of high quality and would be completed in an efficient and cost-effective manner. Here again, Kinay created an association with another globally-respected entity to lend prestige to the Project, thereby creating a false air of legitimacy.

13.     Turks (*i.e.*, Kinay and Serim) instead contracted with defendant Dellis Construction Ltd. ("DCL")—a shell entity with no construction experience that Kinay himself created, owned, controlled, manipulated and ultimately used to siphon money from the Project— to perform the large and complex construction project.

14.     Thus, Kinay and Serim secretly set the Project up to feature a blatant financial conflict of interest between the developer and the contractor that they controlled and which was ripe for their exploitation. Kinay and Serim subsequently used this insider, sweetheart contract between Turks and DCL to illicitly steal tens of millions of dollars from the Project and Purchasers.

15.     Furthering the deception, Kinay also misrepresented that the Project had secured sufficient up-front financing to complete the construction of the Hotel, hotel facilities, condominiums and Purchasers' Villas, all around the same time.

16.     The financing that Kinay and Serim through their alter-ego entities ultimately did get from TTUTC, in August 2008, was woefully insufficient and only furthered the fraud against Purchasers.

17.     But, in order to induce Purchasers to continue making payments, both Kinay and TTUTC trumpeted the loan as "construction" financing, when in reality, unbeknownst to

Purchasers, less than 10% of the $62 million in loan proceeds even was available for construction and the remainder paid off Kinay's and Serim's preexisting debts.

18. The TTUTC loan also contained facially outrageous terms that Kinay and TTUTC intentionally hid from Purchasers including the fact that the loan was back-loaded with a $47 million lump payment due after 24 months and featured an exorbitant interest rate of 15%. Thus, the loan was nothing more than a temporary stop-gap that only staved off the Project's ultimate demise in order to allow Kinay more time to squeeze additional money from Purchasers.

19. The *quid pro quo* for TTUTC was a security interest in the island itself. Thus, TTUTC helped Kinay liquidate his largest, most illiquid asset in order to pay off preexisting creditors (including TTUTC itself), at the expense of Purchasers. Knowing full well that the Project was underfunded and already in severe financial distress, TTUTC's "loan" in fact was a fraudulent back-door purchase of the island and should be undone.

20. Indeed, previously undisclosed 2008 audited financials for DCL and Turks conclusively prove that Kinay, Serim and TTUTC knew that the project was insolvent by tens of millions of dollars with no hope of revival.

21. Specifically, the auditor's report for DCL showed receivables due from Turks approaching $30 million and concluded that recovery from Turks was highly unlikely. This was because Turks itself had a hole over $20 million on its books (and one approaching $100 million in reality), had other "significant commitments," and faced a situation whereby committed financing and future installment payments were "not sufficient to meet the future commitments of the Company."



22. Thus, the auditor concluded that these circumstances lent "significant doubt as to the ability of [Turks] to meet its obligations as they come due, and accordingly, the appropriateness of the use of accounting principles applicable to a going concern."

23. In turn, the auditor concluded that "[t]hese circumstances lend significant doubt as to the recoverability [by DCL] of amounts due from Turks Ltd., and, accordingly, the appropriateness of the use of accounting principles applicable to a going concern in the preparation of the financial statements of [DCL]."

24. But TTUTC joined Kinay and his associates in purposefully keeping Purchasers uninformed about the Project's true financial condition and the alarming details of the loan even as Kinay continued to perform targeted and limited construction on the Villas (to the exclusion of the rest of the Project) with the sole intent to trigger further installment payments.

25. In February 2009, the first nominal payment under the TTUTC loan came due. Kinay and TTUTC intentionally withheld from Purchasers that the Project was unable to make even this relatively small repayment and instead secretly entered into another loan agreement whereby TTUTC loaned the Project even more money in order to pay itself off, at an even higher interest rate.

26. Purchasers' "Roof" payments were due between April and June 2009. Knowing that Purchasers would not make these payments without seeing any progress on the Hotel or related amenities, Kinay shifted his scheme into overdrive.

27. First, he announced a new "plan" for the Project that involved significantly reducing the Hotel's size, which he pitched as offering more "exclusivity." In fact, the new plan simply gave Kinay an excuse for putting off hotel construction until after the Villa roofs could be completed and he could abscond with Purchasers' money.



28.　Second, in March and April 2009, Kinay and his associates repeatedly misrepresented that the Project was flourishing, was closing in on nearly $100 million in new sales, and was "on budget" and "on schedule." These statements were outright lies and were accompanied by Kinay's overt threat of legal action if Purchasers did not make their payments.

29.　Finally, Kinay and Serim enlisted both TTUTC and Mandarin to provide letters that they could provide to Purchasers to falsely comfort them concerning the Project's well-being. Thus, TTUTC expressed its absolute confidence in Kinay's and Serim's ability "to complete this Project" and Mandarin wrote that it was "very excited about the project planning."

30.　But both TTUTC and Mandarin knew that the Project was insolvent, was about to collapse and that their own representations were going to be used in an effort by Kinay and Serim to fraudulently procure additional payments from Purchasers.

31.　Each Purchaser made his roof payment in reliance on these misrepresentations.

32.　Kinay knew at that point (Summer 2009) that he had extracted all he could from Purchasers.

33.　In July 2009 the Commission of Inquiry, which was established to investigate corruption in the Government of Turks and Caicos, publicly issued its report (the "Corruption Report").

34.　The Commission of Inquiry found that Kinay likely had engaged in illegal activity and suggested a criminal investigation be launched.

35.　The Corruption Report set forth how Kinay gave a $500,000 bribe (consisting of money embezzled from the Project) to the then-Premier of the Government in order to receive a below-market price on another island property, Joe Grant Cay (which, upon information and



belief, also was purchased in part with embezzled Project funds). The Corruption Report recommended that a criminal investigation of Kinay and his cohorts ensue.

36.     Understanding that he no longer could expect to receive further payments from Purchasers and aware that his fraudulent and illegal schemes were on the brink of exposure due to the Corruption Report, Kinay hastily began to shut down the Project.

37.     By August 2009, construction had ceased altogether, leaving Purchasers owning barren parcels of land containing partially built Villas and surrounded by a construction wasteland. Kinay publicly announced the halt of the Project on October 12, 2009, only months after he had insisted to Purchasers that the Project was financially sound, demanded millions of dollars in installment payments, and threatened to sue them if they did not pay.

38.     TTUTC soon thereafter asserted its purported first-position lien on Turks's land, as it always had planned given that the Project's poor financial state had been obvious to TTUTC since it first made the $62 million "loan to own."

39.     It subsequently was learned that Kinay and Serim diverted tens of millions of dollars from the Project to themselves, and tens of millions more remain unaccounted for. In sum, Purchasers were the victims of a colossal fraud and lost over $50 million as a result.

40.     This lawsuit seeks full compensation for the harm that they suffered.

## THE PARTIES

41.     Plaintiff Llewellyn Connolly ("Connolly") is a U.S. citizen and is domiciled in New York.

42.     Plaintiff Dodgar Partners Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Connolly used to purchase his land and Villa.

43.     Plaintiff Edward Razek ("Razek") is a U.S. Citizen and is domiciled in Ohio.

44.     Plaintiff Ocean Villa 4 (D.C.) Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Razek used to purchase his land and Villa.

45.     Plaintiff Thomas Walker III ("Walker") is a U.S. citizen and is domiciled in New York.

46.     Plaintiff Beach Villa V. D.C. Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Walker used to purchase his land and Villa.

47.     Plaintiff Andrey Ivanov-Galitsyn ("Galitsyn") is a Russian citizen and is domiciled in Russia.

48.     Plaintiff Villa 7 Dellis Cay Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Galitsyn used to purchase his land and Villa.

49.     Plaintiff Estefano Isaias ("Isaias") is an Ecuadorian citizen and is domiciled in Ecuador.

50.     Plaintiff Salinas on the Beach Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Isaias used to purchase his land and Villa.

51.     Plaintiff Stéphane and Sandrine Pictet ("Mr. and Mrs. Pictet") are Swiss citizens and are domiciled in Switzerland.

52.     Plaintiff Thomas Singh ("Singh") is an Indian citizen and is domiciled in the United Kingdom.



53.     Plaintiff Upwey Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Singh used to purchase his land and Villa.

54.     Plaintiff Michael Topr ("Topr") is a U.S. Citizen and is domiciled in New York.

55.     Plaintiff Ocean Villa 2 (D.C.) Ltd. is designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Topr used to purchase his land and Villa.

56.     Plaintiffs Mikal and Tammy Watts ("Mr. and Mrs. Watts") are U.S. citizens and are domiciled in Texas.

57.     Plaintiff 313TW Caribbean Investment Ltd. is a designated corporate entity incorporated in and with its principal place of business in Turks and Caicos, which Mr. and Mrs. Watts used to purchase their land and Villa.

58.     Defendant Cem Kinay was the principal and driving force behind the Project. Upon information and belief, Kinay is an Austrian national, domiciled in Florida, with a long history of dealings in the real estate and hospitality industries.

59.     Kinay also is a U.S. citizen and has maintained a residential presence in and around Miami, Florida since approximately April 2005. Since approximately July 2010, Kinay has maintained a residence at 27 Grand Bay Estates Circle in Key Biscayne, Florida. This property is owned by Eleonora Properties, LLC, a Florida entity of which Massimino Cellino ("Cellino") is the sole Manager. Cellino is, upon information and belief, an Italian scam artist who twice has been convicted of fraud.

60.     Defendant Oguz Serim is a long-time business associate of Kinay's, is Kinay's partner in the O Property Collection venture and upon information and belief has financial interests in each of the entities related to the Project.



61. Upon information and belief, Serim is a citizen of Austria and is domiciled in Turkey.

62. Defendant The O Property Collection USA, Inc. is a Florida corporation with a principal place of business in Florida that was formed by Kinay and Serim in or around 2006 as an international real estate development company that was to invest in, market, develop and manage various luxury properties.

63. Upon information and belief, defendant The O Property Collection GmbH is an Austrian corporation with its principal place of business in Austria that was formed by Kinay and Serim in or around 2006 as an international real estate development company that was to invest in, market, develop and manage various luxury properties.

64. Upon information and belief, defendant The O Property Collection TCI Ltd. is a Turks and Caicos corporation with its principal place of business in Turks and Caicos that was formed by Kinay and Serim in or around 2006 as an international real estate development company that was to invest in, market, develop and manage various luxury properties.

65. Defendants The O Property Collection USA, Inc., The O Property Collection GmbH and The O Property Collection TCI Ltd. are referred to collectively herein as the "OPC Defendants."

66. The OPC Defendants are alter-egos of each other and of Kinay and Serim.

67. Upon information and belief, the OPC Defendants were the entities through which Kinay and Serim marketed the Project to prospective purchasers.

68. Kinay is President and CEO of each of the OPC Defendants.

69. Kinay and Serim exercise complete domination and control over the OPC Defendants.



70.     Upon information and belief, defendant Turks General Partners Ltd. is a Bahamian company registered in Turks and Caicos with its principal place of business in the Bahamas that was incorporated in or around June 2005.

71.     Upon information and belief, defendant Turks Development L.P. is a Turks and Caicos exempted limited partnership with its principal place of business in Turks and Caicos. Upon further information and belief, its general partner is defendant Turks General Partners Ltd. and its limited partners are CEBU 1 (wholly-owned by Kinay) and CEBU 2 (wholly owned by Serim), both incorporated in Malaysia. As alleged herein, Turks Development L.P. presently is in receivership.

72.     Upon information and belief, defendant Turks (B.V.I.) Holdings Ltd. is a British Virgin Islands holding company with its principal place of business in the British Virgin Islands that was incorporated in or around June 2005. Upon further information and belief, Turks (B.V.I) Holding Ltd. is wholly owned by defendant Turks Development L.P.

73.     Upon information and belief, defendant Turks Ltd. is a Turks and Caicos ordinary or local company with its principal place of business in Turks and Caicos that was formed in or around June 2005. Upon further information and belief, its sole shareholder is Turks (B.V.I.) Holdings Ltd. As alleged herein, Turks presently is in receivership.

74.     Defendants Turks General Partners Ltd., Turks Development L.P., Turks (B.V.I.) Holdings Ltd. and Turks (the "Turks Defendants") are interrelated corporate entities that all were completely controlled and dominated by Kinay and Serim.

75.     Specifically, Turks owned all of the private land on Dellis Cay save four lots. In turn, Turks (B.V.I.) Holdings Ltd. was the holding company for Turks, Turks Development L.P. was the parent of Turks (B.V.I.) Holdings Ltd., and Turks General Partners Ltd. was the General

Partner of Turks Development L.P. Moreover, Kinay and Serim ultimately owned equal 50% shares in Turks Development L.P. through its limited partners CEBU 1 and CEBU 2. And Kinay was the sole director of Turks Development L.P., the sole director of Turks (B.V.I.) Holdings Ltd. and the sole director of Turks.

76.     Turks Development L.P. and Turks presently are in receivership under the direction of defendant William Tacon ("Tacon"), who was appointed as receiver by TTUTC pursuant to the terms of a loan agreement described herein. Tacon is associated with Zolfo Cooper and is based out of the British Virgin Islands.

77.     Upon information and belief, defendant Dellis Construction Ltd. is a Turks and Caicos company with its principal place of business in Turks and Caicos that originally was formed in or around February 2007 as an LLC.

78.     Upon formation, the shares in DCL were owned 100% by Kinay.

79.     In or around June 2007, Kinay transferred his shares in DCL to Turks.

80.     In or around May 2008, Turks transferred 50% of its shares in DCL to defendant Mer Insaat ("Mer").

81.     In December 2008, Mer transferred its shares in DCL back to Kinay. Thus, upon information and belief, Kinay and Turks currently each own 50% of outstanding DCL shares.

82.     DCL presently is in liquidation in the Turks and Caicos courts under the direction of defendant Stephen Katz ("Katz"), who was appointed as Provisional Liquidator by the Supreme Court in Turks and Caicos. Katz is associated with David Rubin & Partners, LLP and is based out of London.

83.     The OPC Defendants, the Turks Defendants and DCL are referred to collectively herein as the "Corporate Alter-Ego Defendants."



84.     As alleged herein, all of the corporate entities were undercapitalized, Kinay and Serim commingled and diverted funds between and away from corporate accounts, and, upon information and belief, each entity abjectly failed to engage in common corporate formalities. Accordingly, any judgment against Kinay and Serim should be enforced jointly and severally against the Corporate Alter-Ego Defendants.

85.     Defendant Marjorie Kinay is Cem Kinay's wife, and, upon information and belief, is a United States citizen who is domiciled in Florida. She has maintained a residential address in and around Miami, Florida since approximately April 2005.

86.     Defendant Cenk Kinay is Cem Kinay's brother, and, upon information and belief, is a citizen of Austria and is domiciled in Turkey.

87.     Upon information and belief, defendant The SUU Hotels ("SUU") is a Turkish company with its principal place of business in Turkey that develops and manages small-scale luxury "lifestyle" hotels, including a hotel in Turkey and one in Costa Rica.

88.     Cenk Kinay is the nominal "founder and CEO" of SUU.

89.     Upon information and belief, Kinay and/or Serim are the actual beneficial owners of SUU.

90.     Defendant Trinidad and Tobago Unit Trust Corporation is a Trinidad and Tobago financial services company with its principal place of business in Trinidad and Tobago.

91.     TTUTC has multiple U.S. subsidiaries, including an investment fund and companies that provide broker-dealer and investment advisory services to the fund.

92.     TTUTC does business in New York, including through its subsidiary investment fund—the UTC North American Fund, Inc. (the "Fund")—which is incorporated in New York and maintains a mailing address at 150 Motor Parkway, Suite 109, Hauppauge, NY 11788.



93.    As of June 30, 2010, TTUTC owned 72.07% percent of the outstanding shares of the Fund.  Multiple TTUTC officers are either Board members or principal officers of the Fund.

94.    TTUTC's 2009 Annual Report shows that net assets of the Fund are consolidated in TTUTC's financial statements.

95.    The Fund operates as TTUTC's investment arm in the U.S.

96.    The 2009 Annual Report shows that TTUTC maintains formal banking relations with a New York bank (Citibank).

97.    Defendant Mandarin Oriental Hotel Group International Ltd. is a global hospitality provider with its principal place of business in Hong Kong.  Mandarin Oriental Hotel Group International Ltd. operates hotels around the world, including in New York, where it regularly conducts business.

98.    Upon information and belief, defendant Mandarin Oriental Management (BVI) Ltd. is an affiliate of defendant Mandarin Oriental Group International Ltd. and has its principal place of business in the British Virgin Islands.

99.    Upon information and belief, defendant Mer Insaat ("Mer") is a Turkish construction company with its principal place of business in Turkey.

100.    Upon information and belief, defendant Halis Sumer ("Sumer") is Mer's principal and is a citizen of and is domiciled in Turkey.

101.    In or around May 2008, Mer acquired 50% of DCL's shares from Turks pursuant to a purported "joint venture" agreement.  After Mer/Sumer received over a half-million dollars in payments from DCL over the course of a few months, Mer transferred its shares back to Kinay in December 2008.



102.  Upon information and belief, defendant Avatar Real Estate Services, LLC ("Avatar") is a Florida real estate brokerage company with its principal place of business in Florida. Its members are Saddy Abaunza Delgado, P.A., Belinda K. Sime, Vivian Z. Dimond and Toni L. Schrager, all who, upon information and belief, are domiciled in Florida. Upon information and belief, Avatar regularly conducts and solicits business in New York.

## JURISDICTION AND VENUE

103.  This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §1332, because the action is between citizens of different States and citizens or subjects of a foreign state are additional parties, and because the amount in controversy is more than $75,000.

104.  Personal jurisdiction and venue are proper in this Court because each of the defendants either conducted and/or solicited business in New York and/or engaged in tortious activity outside New York that caused injury to Plaintiffs inside New York.

## FACTUAL BACKGROUND

105.  Dellis Cay, located in the Caribbean, is one of the islands that comprise the Turks and Caicos Islands.

106.  Prior to Kinay's and Serim's involvement with Dellis Cay, the island was owned by Zeta Ltd., a company controlled by Donatella Zingone ("Zingone").

107.  In or about 2005, Kinay and Serim through their alter-ego Turks purchased nearly all of the private land on Dellis Cay (save four lots retained by Zingone), consisting of approximately two-hundred and nine (209) acres. (The 209 acres are referred to herein as the "Site").



108.   Upon information and belief, at the beginning of 2009, Turks also entered into an agreement with the British Crown and the Government of Turks and Caicos whereby Turks was granted an exclusive 200-year license to utilize a significant area of land on the seabed adjacent to Dellis Cay.

109.   After acquiring the Site, Turks subsequently negotiated a development agreement with the Turks and Caicos government to develop a luxury mixed-use project thereon consisting of a five-star hotel, various hotel amenities, condominium units and private single-family residences, including the "Ocean" and "Beach" villas that were purchased by the plaintiff Purchasers.

### Kinay and Serim Aggressively Market the Project as the Utmost in Luxury

110.   Kinay and Serim and their alter-ego OPC entities aggressively promoted the Project to prospective Villa purchasers through various marketing techniques.

111.   The Project was marketed by Kinay, Serim and their agents as featuring the utmost in luxury and exclusivity.  Among other things, promotional materials for the Project represented that Dellis Cay would become "one of the most exclusive destinations in the world" and would feature "the world's rarest living experience."

112.   Kinay and his agents echoed these representations in their pitches to Purchasers. For instance, Sebastian Steinau ("Steinau") (Kinay's head of sales for the Project) gave a sales pitch at a presentation at the New York Mandarin Oriental (attended by, among others, Razek), wherein Steinau bragged that the Project would be the finest in the Caribbean and among the best in the world.

113.   Steinau also represented to Purchasers that their neighbors would be among the world's elite.  For instance, Steinau told Mr. and Mrs. Watts that they would be joining



Hollywood stars, elite British bankers, and the like.  He told Mr. Pictet and Connolly that one of the Villa owners was an unnamed famous tennis player.  He told Walker that all of the Villa buyers were "spectacular."

114.  Similarly, in an effort to demonstrate to Purchasers the purported "exclusivity" and value of the Project as an investment, Kinay and his agents often advertised (both publicly and privately to Purchasers) that Hollywood couple Michael Douglas and Catherine Zeta-Jones were among the first Villa owners and had recognized the Project's appeal by investing early. However, this representation was overtly misleading.  Upon information and belief, other than a token payment, Douglas and Zeta-Jones invested virtually no money in the Project and instead were given a Villa for a de minimus fee.  Kinay and his cohorts then used the couple's involvement as a marketing ploy and their purported "purchase" of a Villa became yet another misrepresentation that Kinay and Serim used to induce Purchasers to buy Villas of their own.

115.  From the outset, New York residents were a principal focus of Kinay's and Serim's marketing efforts.

116.  In or around October 2006, Kinay and Serim (through Turks) retained Corcoran Sunshine Marketing Group, which is based in New York, as the exclusive marketing consultant for the Project.

117.  As Steinau proclaimed in a January 31, 2008 news article:  "New York is the biggest market in the U.S. for this island."

118.  Kinay's and Serim's promotional efforts included multiple marketing events held in New York and directed at New York residents.

119. For example, in or around January 2007, Kinay and Serim hosted a cocktail event at the Neue Gallerie on Fifth Avenue in Manhattan to celebrate the New York "launch" of the Project.

120. Kinay and Serim also hosted a launch party/reception at New York's Mandarin Oriental in or around November 2007.

121. A Haute Living Magazine profile of Kinay, dated January 2, 2008, noted that the Mandarin Oriental event targeted "the New York power players that will likely have a strong presence at Dellis Cay."

122. The Project was featured in the "Breaking Ground" section of the New York Times on December 29, 2006. The article provided a website and contact number for the Project. Upon information and belief, Kinay, Serim and/or their representatives provided the information and promotional materials to the newspaper in connection with the publication of the article.

123. The Project also was featured in the New York Post in its "Home: Out of Town" section on December 13, 2007. The article provided a website and contact number for the Project. Upon information and belief, Kinay, Serim and/or their representatives provided the information and promotional materials to the newspaper in connection with the publication of the article.

124. Similarly, the Project was featured in the New York Daily News's Real Estate section on September 4, 2008. The article included a glowing profile of Kinay, and provided a website for the Project. Upon information and belief, Kinay, Serim and/or their representatives provided the information and promotional materials to the newspaper in connection with the publication of the article.

125.    In connection with the Project, Turks submitted to and sought approval for a condominium offering plan for the Project from the New York Attorney General's ("NYAG") Office.

126.    Kinay personally certified the offering plan.

127.    The offering plan was accepted by the NYAG's office on or about September 27, 2007.

**Mandarin's Involvement was an Essential Consideration for Purchasers**

128.    Upon information and belief, in or around November 2006, Kinay and Serim, through their alter-ego entities, entered into various hotel management agreements and certain other agreements with defendants Mandarin Oriental Hotel Group International Ltd. and Mandarin Oriental Management (BVI) Ltd.

129.    The agreements provided that Mandarin received a royalty fee of 1.5 percent of the net proceeds of each Villa and Residence sale, plus a bonus equal to 2.5 percent of any sale price that exceeded $1,000 per square foot.

130.    Mandarin announced the management arrangement on its website on or about November 26, 2006. Mandarin characterized the project as "an exclusive hideaway" ... "located on an unspoiled 35-acre beachfront site" ... "surrounded by pristine white sands, sheltered coral reefs and protected mangrove reserves." Mandarin advertised that the Project offered "unparalleled opportunities for home ownership." The then-Group Chief Executive of Mandarin stated that the Project would be a "remarkable retreat, offering all of the luxury quality and attention to detail" for which Mandarin was known.

131.    Upon information and belief, Mandarin had a right under the management agreements to have a representative inspect the Project's books and records. Thus, Mandarin would or should have been aware of the Project's financial condition.

132. At the outset, Mandarin licensed Kinay and Serim to use its name and logo in promoting the Project. In particular, the License Agreement and Marketing License Agreement granted Kinay and Serim a license to use Mandarin trademarks, service marks, trade names, logos and designs in their marketing, promotion and advertising efforts.

133. Mandarin knew or should have known that Kinay's use of its name and mark added a patina of legitimacy to the Project in the eyes of Purchasers and potential purchasers.

134. Moreover, Mandarin's involvement in the Project added substantially to the projected value of the Villas, and thereby was an essential consideration for Purchasers in their initial purchase and their subsequent making of construction stage payments.

135. Without Mandarin's association with the Project, it would have been much less appealing as an investment opportunity for Purchasers.

136. Kinay, his partners and his alter-ego entities knew all of this, and maximized the use of Mandarin's name and logo to the fullest extent, including them on, among other things, all correspondence with Purchasers and all Project promotional materials. Thus, Kinay (with Mandarin's compliance) marketed the Project not merely as "Dellis Cay," but rather, as the "Mandarin Oriental Dellis Cay."

**Misrepresentations and Fraudulent Omissions Concerning the General Contractor**

137. Purchasers' development agreements provided that DCL would deliver the Project to completion.

138. As DCL had no contracting experience whatsoever, Kinay (mis)led Purchasers to understand that DCL would retain an experienced and reputable general contractor to oversee construction on Dellis Cay.

139. In a June 2007 letter to Purchasers' counsel, Kinay represented that Turks had selected two general construction candidates, "both very reputable with a strong record."

22

140. He represented further that Memorandums of Understanding had been executed with these candidates, "detailing a clear path to contract."

141. Kinay concluded by stating that Turks would be signing a construction contract for Phase 1A within weeks.

142. "Phase 1A" included, among other things, the Hotel (which was to contain 24 Residences and 25 rooms) and its facilities, supporting infrastructure, nine "Beach Houses" (which were to contain an additional 54 Residences) and Purchasers' Villas.[1]

143. In an August 8, 2007 press release, Kinay announced that OPC had selected ENKA Insaat ("ENKA"), a well-regarded global construction contractor based in Istanbul, to be general contractor for the Project.

144. The release stated that OPC was "pleased to announce the selection of ENKA" for the development of the Project. Kinay was quoted as saying: "We are very pleased to make this announcement today."

145. A representative from ENKA attended a promotional event for the Project at the Mandarin Oriental in New York, where Kinay and his agents advertised ENKA to Purchasers as his "lead builder."

146. Similarly, Project CFO Gabe Garcia ("Garcia") told plaintiff Galitsyn during his visit to Dellis Cay that ENKA—a company Galitsyn was familiar with due to its commercial success in Russia—would be overseeing construction.

147. Kinay or his agents also told Singh that ENKA would be general contractor on the Project.

---

[1] Subsequent "phases" were to include, among other things, additional villas.

148.    Likewise, Kinay or his agents told Walker and Connolly that a major international contractor would be heading construction efforts.

149.    In a March 2008 letter to Purchasers, Kinay again represented that "we" had executed a construction contract with ENKA.

150.    These representations concerning ENKA were false when made.

151.    Kinay's supposed retention of ENKA as general contractor for the Project was an essential consideration for Purchasers in making their initial decision to buy because it provided extra assurance that construction would be of high quality, would be done in an efficient manner, and would be overseen by a trustworthy company with a long history of success in completing large-scale construction projects.

152.    Upon information and belief, Kinay in fact <u>never</u> contracted with ENKA.

153.    Upon information and belief, Kinay intentionally misrepresented the purported retention of ENKA to deceive both Purchasers and prospective purchasers, as well as lenders from which Kinay was seeking financing for the Project.

154.    Turks eventually "contracted" with DCL for $250 million to construct Phase 1A of the Project, even though DCL, yet another alter-ego entity controlled and created by Kinay, had <u>zero</u> construction experience.

155.    Kinay controlled DCL and at all times either he or Turks (which Kinay and Serim also controlled) held at least a 50% interest in DCL. Thus, the DCL contract created an obvious (and undisclosed) risk of fraud that Kinay and Serim subsequently exploited.

156.    Whereas an arms-length relationship between the Project manager and the contractor normally would put a check on contractor expenditures, the DCL contract contained an inherent conflict of interest that provided the opposite and improper incentive for Kinay and

Serim to "overpay" for construction services furnished by their own company, and to otherwise do away with the usual checks on abuses and fraud.

157.    Kinay and Serim used the self-interested contract between Turks and DCL to funnel Purchaser funds to themselves and their associates rather than to the Project.

158.    For instance, upon information and belief, the construction contract between Turks and DCL was for approximately $250 million, with an advance payment of five percent. Thus, Kinay and Serim effectively paid themselves $12.5 million in an up-front fee that served no legitimate purpose given that they controlled both parties to the contract.

159.    Upon information and belief, these funds never went to the Project.

160.    Furthermore, in conjunction with the construction contract being executed, upon information and belief, DCL was made a joint venture between Turks and Mer by which Mer assumed 50% of DCL shares from Turks (which retained the other 50%).

161.    Upon information and belief, Kinay created the purported joint venture solely for the purpose of increasing DCL's legitimacy in the eyes of potential purchasing and financing sources.

162.    Kinay intentionally failed to disclose the DCL "contract" to Purchasers, much less its blatant self-interested nature.

163.    Once Kinay ultimately acquired financing (as discussed below), he quickly terminated the arrangement with Mer (which transferred its shares to Kinay) after having paid off Mer and its principal, defendant Sumer, in sums totaling over a half-million dollars.

**Misrepresentations and Fraudulent Omissions Concerning Project Financing**

164.    Kinay and his agents also misrepresented to Purchasers that Kinay had acquired up-front financing sufficient to see the construction of Phase 1A through to completion.

165.    For instance, Steinau told Razek that the Project was fully financed and that money was no concern.

166.    Similarly, Mr. Pictet asked one of Kinay's agents whether the Project had sufficient financing, and was told that money was no problem and the Project was backed by a large banking institution.

167.    In a March 2008 letter to Purchasers' counsel, Kinay advertised that Turks had signed a loan agreement with Scotiabank on March 13, 2008, which supposedly was to finance the Project through the completed construction of the Hotel, hotel amenities, infrastructure, Residences and Villas.  In a meeting with Purchasers' counsel around this same time, Kinay represented that the amount of the purported Scotiabank financing was approximately $200 million.

168.    In that same letter, Kinay also reported that Scotiabank had issued a Commitment Letter several months earlier.

169.    Kinay's representations were false when made.

170.    In fact, the Scotiabank financing never was finalized—a fact that Purchasers were unaware of.

171.    Kinay's securing sufficient funding was crucially important to Purchasers because the value of their Villas was dependent on the Project being completed as planned, with all of the components (Hotel, Residences, etc.) working together to create value for all interested parties.

172.    For example, Connolly told Kinay and his agents in approximately March 2008 that he would not purchase until Project financing was confirmed.  At a meeting in Key

Biscayne, Florida around this same time, Kinay assured Connolly that the Project was fully financed in an amount between $200 and $250 million. The March 2008 letter referenced above was Kinay's written confirmation of this assurance. Based upon all of these misrepresentations, Connolly closed on his property and Villa just weeks later, at the end of March 2008.

173. Kinay intentionally misrepresented the state of the Project's financing efforts because he wanted to induce Purchasers to stay invested and make future installment payments under their development contracts (and induce those who had not yet purchased to do so).

**The Terms of Plaintiffs' Purchases**

174. Based on Kinay's and Serim's representations concerning the world-class nature of the Project, Mandarin's and ENKA's involvement, and the Scotiabank financing, each Purchaser purchased (either individually or through a designated corporate entity) a residential lot from Turks and contracted with Kinay and his entities for the delivery of a Villa thereon.

175. The purchase prices for the residential lots ranged between approximately one million and three million dollars. Collectively, Purchasers' payments for their land under their purchase and sale agreements totaled over $16 million.

176. The Villas were paid for via installment payments totaling many millions of dollars that were contingent upon the sponsor's (Kinay and his interchangeable alter-ego entities) achievement of certain Villa-construction milestones.

177. In general, the payments were broken down as follows: 10% of the development contract sum upon execution thereof; 20% of the contract sum in connection with the commencement of Villa construction; 20% of the contract sum in connection with completion of the Villa floor slab; 30% of the contract sum in connection with completion of the Villa roof; and 20% of the contract sum upon practical completion of the Villa.

178.     Collectively, Purchasers' installment payments under their development contracts totaled over $33 million.

179.     Thus, between the payments for the lots and the installment payments for development of the Villas, Purchasers paid over $50 million to Kinay and Serim and their entities.

180.     The purchase and sale agreements between Purchasers and Turks provided that Turks would "substantially complete" Phase 1A of the Project on or before the date when the Purchasers were issued with certificates of occupancy for their respective Villas.

181.     This clause was important to Purchasers because it represented Kinay's assurance that he would "deliver" the entire Project all at once, meaning that Purchasers would not be thrust into the awkward position whereby they would be forced to make substantial stage payments on their Villas without seeing parallel progress on the Project as a whole.

182.     Such assurance was crucial because completion of the entire Project as advertised was an essential component of Purchasers realizing the full expected value of their Villas.

183.     In or around May 2008, actual construction at the Project began.

184.     Around this same time, those Plaintiffs who already had purchased made their "Commencement" payments under their development contracts (generally 20% of the total contract amount).

### TTUTC's Fraudulent Loan Agreement with Kinay and Serim

185.     In or around August 2008, Turks Development L.P., Turks (B.V.I.) Holdings Ltd. and Turks (all alter-ego entities for Kinay and Serim) entered into a Syndicated and Transferable Loan Agreement ("Loan Agreement" or "Loan") for $62 million with TTUTC.

186.     Kinay intentionally withheld from Purchasers that the TTUTC Loan was instead of, rather than in addition to, the previously promised $200+ million Scotiabank financing.

Moreover, when Connolly specifically asked this exact question to Kinay's agents, head of marketing and public relations Ingo Reckhorn ("Reckhorn") explicitly misrepresented that the TTUTC Loan supplemented already in-place financing.

187.    In making the Loan, TTUTC was aware of the development contracts signed by Purchasers that required installment payments, several of which remained outstanding. Furthermore, TTUTC knew that Purchasers were at an informational disadvantage regarding the status of the Project and therefore were highly vulnerable to fraud or diversion of their payments by Kinay and his associates.

188.    In a press release issued concurrent with the Loan execution (which Kinay and his cohorts purposefully distributed to Purchasers) Kinay and TTUTC loudly advertised the Loan as "construction and takeout finance."

189.    Kinay repeated this representation in a subsequent letters to Purchasers, dated October 21, 2008, writing that "we have completed our refinancing, and construction funding" with TTUTC.

190.    In the same press release referenced above, Marlon Holder, the Executive Director of TTUTC, wrote the following:   "With Dr. Kinay's present success with the developments' sales, construction's progress, and now with the current NES Loan, we believe that he and his team will achieve a significant momentum to complete the project within time and budget."

191.    Both Kinay and TTUTC knew these statements were false when made and were intended to be relied upon by Purchasers.

192.    Kinay and TTUTC intentionally misrepresented that the Loan provided "construction finance" and that the Project would be completed "within time and budget" for the

purpose of convincing Purchasers and prospective purchasers that the Project was sufficiently funded going forward and thereby inducing Purchasers to continue to make stage payments on their Villas (or prospective purchasers to buy in the first instance).

193. In publicly representing that it "believe[d] that [Kinay] and his team will achieve a significant momentum to complete the project within time and budget," TTUTC stepped out of the shoes of a mere lender and into those of a joint promoter.

194. Indeed, TTUTC executives attended and participated in many marketing events for the Project, organized by Kinay.

195. Contrary to Kinay's and TTUTC's affirmative representations, less than $6 million out of the total $62 million "construction" Loan proceeds were available to the Project after the bulk of the proceeds were used to immediately satisfy preexisting debt, including Kinay's preexisting debt to TTUTC. Moreover, Kinay siphoned most or all of the limited funds that were available to himself, rather than putting them toward actual construction.

196. Kinay withheld this highly material fact from Purchasers until after the Project failed, at which point he finally admitted (once it made no difference) that only $6 million of the total "construction" Loan proceeds were available for actual going-forward construction and so-called "working capital needs."

197. Kinay and TTUTC intentionally withheld the true terms of the Loan because those terms unequivocally would have shown that it was not a construction loan and that there were not sufficient funds to complete the Project.

198. Had Purchasers known that the Loan was not "construction finance" as Kinay and his cohorts at TTUTC falsely had advertised, but rather a mere refinancing of preexisting debt such that Kinay was keeping the Project on temporary life support, they would have realized that

the Project was not viable and could have protected their investments by not making further stage payments (or for future purchasers, not purchasing in the first instance).

199. The Loan also contained facially outrageous terms that operated to TTUTC's overwhelming benefit and practically ensured that the Loan would result in default.

200. For instance, the repayment clause in the Loan Agreement provided that the borrower was to repay the $62 million principal by three $5 million semi-annual installments followed by a $47 million balloon installment at the end of only two years.

201. Had Kinay or TTUTC informed Purchasers of this fact, it would have disclosed that the Loan in effect was a temporary stopgap measure that merely staved off all-but-guaranteed default.

202. Additionally, Purchasers were not informed that the interest rate on the Loan was set at the outrageous rate of 15% per annum.

203. Kinay and TTUTC intentionally withheld this information from Purchasers because a rate bordering on usury was a telling indicator that Kinay could not secure more favorable lending terms (either from TTUTC or any other lender) due to the Project's precarious financial condition.

204. Kinay and TTUTC failed to disclose the excessive balloon payment and the extreme interest rate while at the same time promoting the Loan as transformative "construction" financing that would see the Project through to completion.

205. Kinay and TTUTC did so because, if Purchasers knew the truth, they would have pulled out of the Project and ceased making installment payments.

206. Unbeknownst to Purchasers, the Loan also collateralized their future payments such that incoming funds were to be deposited in one of two TTUTC accounts held with Scotiabank.

207. A full 20% of Purchaser payments were to be deposited into a "Reserve Account" and held as security for the Loan (to which Purchasers were not a party) and interest thereon. The remaining 80% of incoming payments were to be deposited into a "Release Account," and released for Project costs only upon satisfactory showings of how the funds would be used. As such, 20% of Purchaser payments were going directly to the benefit of TTUTC, and 100% of Purchaser payments were going to be under TTUTC control, as opposed to being directed to DCL for the purposes of construction, which is what Purchasers were led to believe by Kinay and his cohorts.

208. Kinay's and TTUTC's intentional withholding of this information from Purchasers was material because Purchaser payments now would not be applied directly to construction, and in some cases, never would be. Indeed, per the terms of the Loan Agreement, "principal and interest payments" were to "be made from the Reserve Account" "to the extent possible" (and from the Release Account "only if and to the extent that there are insufficient funds in the Reserve Account").

209. TTUTC's control of and interest in Purchasers' installment payments was used to reduce Kinay's personal liability to TTUTC, and intentionally was withheld from Purchasers until after the Project collapsed.

210. Finally, the security for the Loan was Dellis Cay itself. Specifically, the Loan was secured by a purported first-position lien on the private property on Dellis Cay still owned by Turks (*i.e.,* other than that already owned by Purchasers) (the "Project Land").

211.    When the Loan was finalized in August 2008, both Kinay and TTUTC already knew that the Project was significantly underfunded and was destined to collapse in the future, in which case Purchasers and other creditors would have legal claims against Kinay and his related entities.

212.    In securitizing the Project Land in order to pay off preexisting debts and line his own pockets, Kinay intended to defraud anticipated future creditors (including Purchasers) by liquidating an otherwise illiquid asset.

213.    TTUTC's motivation was to gain a first-position lien over other creditors and to protect itself at the expense of Purchasers.

214.    TTUTC falsely advertised the Loan as for "construction" when it knew that the borrowers had no ability to repay and were likely to default. TTUTC was not a bona fide lender for value without notice. Instead, the Loan effected a fraudulent back-door purchase of the Project Land (*i.e.*, a classic "loan to own" scheme").

215.    Accordingly, TTUTC's purported first-position lien is not legitimate and should be subordinated or cancelled.

### PwC's Audit Reports for DCL and Turks Showed the Project's Dismal (and Undisclosed) Financial Condition

216.    What Kinay, his associates, and TTUTC knew, but intentionally withheld from Purchasers, was that the TTUTC Loan was woefully insufficient and that sales came to a complete halt in the Fall of 2008, which Kinay eventually admitted only after the Project collapsed.

217.    Thus, the Project was in clear financial peril by the second half of 2008 at the latest, even as the TTUTC Loan was being closed.

218.   Indeed, unbeknownst to Purchasers, PriceWaterhouseCoopers ("PwC") audited DCL's financials for 2008 (the "PwC Report" or "Report") as well as those of Turks. The Report was issued on or about April 27, 2009 and provides plain evidence that the Project was on the brink of failure.

219.   The Report showed receivables due to DCL from Turks exceeding $28 million (roughly 70% of DCL's then-current assets).

220.   Accordingly, the Report concluded that "the recovery of amounts due" from Turks was dependent on Turks "maintaining adequate financing to fulfill its operating needs and achieving revenue adequate to support its cost structure."

221.   In this respect, the DCL audited financials noted that the audited financials for **Turks** for 2008 included the following disclosures:

> As indicated in these financial statements, the Company's accumulated deficit totaled $20,156,305 at December 31, 2008 (2007: $9,893,364). In addition to this, the Company has significant commitments as further discussed in Note 15. The future cash inflows from contracted sales and committed financing facilities **are not sufficient to meet the future commitments of the Company**, and the Company is therefore dependent on future sales, additional financial support from debt financing, equity financing, other affiliated companies or its shareholder to finance the operations. **These circumstances lend significant doubt as to the ability of the Company to meet its obligations as they come due, and, accordingly, the appropriateness of the use of accounting principles applicable to a going concern**.

222.   In turn, PwC explained that "[t]hese circumstances lend significant doubt as to the recoverability [by DCL] of amounts due from Turks Ltd., and, accordingly, the appropriateness of the use of accounting principles applicable to a going concern in the preparation of the financial statements of [DCL]."

223.    Moreover, the $20+ million deficit admitted to in Turks' books was in itself fraudulent.  Upon information and belief, the deficit in fact was much closer to $100 million once accounting for Turks' gross inflation of the value of "works in construction."

224.    In short, by year-end 2008 at the latest, DCL's future viability was wholly dependent on that of Turks, and Turks's future viability in turn was wholly dependent on future financing and/or additional sales, as contracted sales and committed financing were not sufficient to meet Turks's future commitments.

225.    Upon information and belief, Kinay and his associates were fully aware of the contents of the PwC Report long before it formally was issued.

226.    Upon further information and belief, TTUTC also was aware, and was provided with a copy of the PwC audited financials for DCL and Turks.

227.    Despite their knowledge, both Kinay and TTUTC intentionally failed to disclose the true state of the Project's financial condition to Purchasers.

228.    Instead, after closing the TTUTC Loan, and knowing that the Project already was insolvent due to insufficient financing and stalled sales, Kinay set out on a fraudulent course to feign continued construction of the Villas (to the substantial exclusion of the rest of Phase 1A) so as to extract as much money as possible from Purchasers prior to the Project's inevitable collapse.

229.    TTUTC was complicit in Kinay's continuation of his fraud.

230.    Thus, the slabs were poured on the Villas in or around November 2008, which triggered Purchasers' obligation to make their Slab payments under their development contracts (generally 20% of the total contract amount).

231.   Purchasers made the payments, having been intentionally kept completely unaware of the Project's true financial condition.

**TTUTC Provides Additional Funding in Furtherance of the Fraud**

232.   As Purchasers subsequently learned, the first $5 million principal payment on the $62 million TTUTC Loan was due in or around February 2009.

233.   Kinay was unable to make even this relatively minimal payment.

234.   Kinay and TTUTC intentionally hid this highly material fact from Purchasers.

235.   Instead, Kinay and TTUTC teamed up to keep the Project on life support while they worked together to induce further payments from Purchasers.

236.   Specifically, TTUTC loaned the Project an additional $15 million, a portion of which was used to make the initial $5 million payment (with interest) on the $62 million Loan. Moreover, TTUTC loaned this sum at an even higher interest rate than applied to the $62 million loan—17% per annum.

237.   In other words, TTUTC loaned Kinay money at an even higher interest rate to pay itself back on the $62 million loan, when it knew that the Project already was doomed and that its borrower had insufficient funds to repay the Loan or to complete the Project.

238.   Kinay also knew that the Project was failing, but intentionally increased its debt burden on unfavorable terms in order to keep the proverbial music playing so that he could extract more money from Purchasers.

239.   Upon information and belief, the remainder of the proceeds from the $15 million loan were used to pay preexisting debts. Thus, none of the proceeds were applied towards constructing the Project.

240.   Both Kinay and TTUTC withheld the existence and terms of this loan from Purchasers.

241.    Kinay and TTUTC did not disclose the terms because they did not want Purchasers to know that the Project was failing.

242.    Had Purchasers known about this second TTUTC loan and its terms and purpose, they would have pulled out of the Project and not made further stage payments.

**Further Misrepresentations and Fraudulent Omissions
Concerning the Project's Financial Condition**

243.    Beyond hiding the Project's desperate financial condition, as detailed below, Kinay and his agents on several occasions affirmatively misrepresented to Purchasers that the Project was on sound footing and that sales activities had "momentum" when in fact the opposite was true.

244.    As April 2009 approached, Kinay was working to complete the roofs on Purchasers' Villas, which would trigger the largest installment payment yet—30% of the total development contract amount.

245.    Knowing that Purchasers would not pay additional funds into the Project when no work had been done on the Hotel and related facilities, Kinay advanced his fraud even further.

246.    First, Kinay announced that his plans for the Project were being revised. The new plans contemplated scaling back Phase 1A such that the Hotel would be much smaller on a square-footage basis and no longer would contain guest accommodations (either rooms or Residences).

247.    In addition, the total number of Beach Houses would be reduced from nine to eight (to include 36 Residences and 30 dedicated rooms), and a 9-hole golf course was to be added.

248. Kinay pitched the revised plan to Purchasers as one that would result in a more "exclusive" final product. At no time did Kinay or his associates represent that the changes were necessitated by any financial difficulties.

249. In reality, Kinay's revised plan actually provided him with a ready justification for further delaying construction of the Hotel and other support facilities until after work on the Villas was completed. Indeed, Kinay affirmatively represented to Purchasers in an April 1, 2009 letter that his construction teams would "start to build [the Hotel] when they finalize all their work on the beach House Residences, and the Villas by the end of June 2009." Kinay also stated that he "expect[ed]" his "hard construction teams to finalize the Hotel Building's Core & Shell in 2 months (by September 2009)."

250. The previous plan for Phase 1A would not have allowed for this justification given the presumably long construction time associated with building the full-scale Hotel and Kinay's contractual obligation to deliver the entire Project at one time.

251. It also was during this same time period that Kinay first informed Purchasers that the physical construction of the spa would occur in Indonesia and the spa then would be shipped to Dellis Cay via barge and would not arrive until later in 2009.

252. Kinay explained to Purchasers that this meant that there would be "little visible current progress" at the spa site until the prefabricated building was delivered later in 2009. Kinay later admitted in a December 1, 2009 email to plaintiffs Connolly and Walker, among others, (sent well after the Project failed) that the spa never was designed or even ordered.

253. Similarly, Kinay and his associates also informed Purchasers around this same time that the glass sliding doors and windows for the Villas were being manufactured in Columbia, and that while some of the glass had been delivered, it purportedly had failed

"hurricane testing" and had been returned to the manufacturer. Accordingly, Kinay explained that the replacement glass was being re-manufactured and would be installed within months.

254. In fact, the glass never was ordered.

255. In sum, Kinay intentionally created a situation whereby he could explain why very little construction had been done aside from that done on the Villas (essentially their outer shells) and he could defer the obligation to deliver the fully-developed Project.

256. Kinay knew full well that the Hotel and other facilities never would be constructed because the Project was out of money, and fully planned to shut down construction efforts after finishing the Villa roofs and absconding with Purchasers' money.

257. Concerned that their Roof-stage payments were coming due when construction on the Hotel and other common facilities had not even started, Purchasers and their counsel engaged in substantial communications with Kinay and his associates in or around March and April 2009 concerning the continued viability of the Project.

258. Purchasers justifiably were concerned because they faced a situation wherein they would have paid the entire amount on their purchase and sale contracts and 80% on their development contracts before construction on the Hotel even had started.

259. During their communications with Purchasers, instead of disclosing the truth about the Project's dire financial condition, Kinay and his associates repeatedly misrepresented that the Project was on sound financial footing and was on budget and on schedule. For instance:

- In a March 6, 2009 letter to Purchasers, Kinay represented that the "**construction schedule at Mandarin Oriental Dellis Cay is intact**." He also represented that the Project had seen "improvements" in all of its "key performance indicators," including a three-fold increase in "client tours" and a "substantial" increase in the "number of emails, and phone enquiries."

- In a March 20, 2009 letter to Walker, Kinay indicated that "sales activities" had "**kept their momentum during the high season thus far**" and that he currently was negotiating with six different parties representing a total of $50 million worth of new

sales that he expected to close within the next 90 days. Kinay also again represented that the "number of emails and phone enquiries ha[d] increased substantially."

- In an April 1, 2009 letter to Purchasers, Kinay confirmed that the Project was "**on time and on budget**." He also stated that the Project was involved in negotiations for **$95 million in new sales** (few or none of which actually materialized) and referenced a "revolving credit facility" of $20 million that Kinay was "looking forward to closing" with TTUTC in the weeks that followed.

- These written misrepresentations mirrored those made orally to Purchasers during the same time period by Kinay and his agents. For instance, Steinau represented to Mr. and Mrs. Watts during their March 26, 2009 visit to Dellis Cay that the Project was "on schedule," that the Hotel would be "built soon," that the spa was being prefabricated in Indonesia, that the golf course would be "magnificent," and that the hurricane glass was sent back to the manufacturer after hurricane testing because it did not meet the Project's supposedly high standards. Steinau also represented that the Project was on the verge of closing $95 million worth of new sales.

- Similarly, Monica Venegas (the Project's head of international sales) regularly told Isaias that things were "looking good" and "going fine."

- Steinau told Razek that significant sales were on the verge of closing, that the Villas were sold out, and that various unnamed wealthy Russians just had bought several properties.

- During a visit to Dellis Cay in March or April 2009, Project vice president Michel Neutelings told Walker that the Project was on time and would be completed successfully. Neutelings also told Walker when asked that Project employees regularly were being paid.

- Steinau likewise told Mr. Pictet on several occasions that significant sales would be closed shortly.

- Connolly and a residence purchaser conducted a 90-minute conference call with CFO Gabe Garcia around this same time (March/April 2009). Aware that the fiscal year had closed, Connolly asked Garcia whether the Project companies (Turks and DCL) had been certified as going concerns. Garcia misrepresented that they had been. Garcia also stated that the Project had sufficient financing to complete construction.

- Around this same time, Thomas Singh called Kinay to discuss the Project's status. Kinay provided reassurance that construction was on time and budget and that the Project was in sound financial condition. Singh's representative also spoke to Kinay's assistant—Emre Oral—around the same time, and received a similarly positive report.

- In May 2009, Kinay had dinner with Mr. Pictet in Geneva. During that meeting Kinay made no mention of financial problems and represented that everything with the Project was proceeding as planned.

260.  In sum, on several different fronts, Kinay and his cohorts uniformly misrepresented that the Project was in financial good health, even when several Purchasers made

specific, detailed inquiries to insure that they would not be making Roof-payments totaling millions of dollars into a venture that already was doomed.

261.    Not only did he make affirmative misrepresentations and intentionally withhold highly material information, Kinay overtly threatened Purchasers with legal action in the event that they chose to discontinue their participation in the Project and not make their Roof-stage payments.

262.    Specifically, in an April 1, 2009 letter to Purchasers' counsel concerning email inquiries that Purchasers' counsel had forwarded to Kinay's attorney several days earlier, Kinay's first bulleted point expressed "concern" that the questions raised were meant to "constitute a prelude to non-payment of the roof payment[s]."

263.    Kinay threatened that such non-payment would be "in breach of the Purchasers' contractual obligation without contractual justification," as there were "no express or implied contractual provisions which justif[ied] any non-payment or late payment of the roof stage payment."

### Mandarin and TTUTC Act with Gross
### Negligence and Issue Letters Aiding and Abetting the Fraud

264.    With the "Roof" payments due between April and June 2009, Kinay's plan went into overdrive as he enlisted the assistance of TTUTC and Mandarin to further the fraud. In particular, both Mandarin and TTUTC issued letters during this time period that were intended to falsely and recklessly comfort Purchasers concerning the Project's well-being.

265.    On April 2, 2009, Brad Barneson, Mandarin's officer in charge of the Project, wrote a letter at OPC's request that "confirm[ed]" Mandarin's "acknowledgment of the proposed changes taking place on the master planning" for the Project. Barneson added that Mandarin was "very excited about the project planning," that it had "a very close working relationship with

OPC," and that it "look[ed] forward to completing the revisions to the design and development" of the Project.

266. Mandarin knew or should have known that the purpose of this letter was to further the deception, and that Kinay and his team of fraudsters would forward it to Purchasers to provide false reassurance that development efforts were proceeding smoothly.

267. There was no reason whatsoever for Mandarin to provide this letter to its own client (OPC), except that Mandarin knew that the letter would be used by Serim and Kinay to provide a false sense of comfort with the Project even while these changes diminished the value of the Project and even though these changes were never enacted.

268. Indeed, Kinay and his agents showed the Mandarin letter to at least several Purchasers as "evidence" that Mandarin fully backed the revised plan.

269. Similarly, on June 10, 2009, TTUTC Vice President of Merchant Banking Kelly Belmontes, who managed TTUTC's relationship with Kinay and Serim, wrote a letter addressed to Serim at Turks Development L.P. that was written "pursuant to [Serim's] request."

270. In that letter, Belmontes "confirm[ed]" that TTUTC was "supporting the completion of the Dellis Cay project" and represented that TTUTC had "**no doubt in the ability of [the Project's] current management to complete this Project.**"

271. TTUTC knew that Kinay and Serim would send this letter to Purchasers because there was <u>no other reason</u> for it to be drafted and sent to TTUTC's own borrower.

272. The representations in the letter were false.

273. By the time TTUTC wrote it, it had known for almost a year that the Project was doomed. Among other things, TTUTC was holding incoming Purchaser funds pursuant to the

terms of the Loan, and therefore would have known that no new funds were being deposited and that sales had ground to a virtual (if not complete) halt in the Fall of 2008.

274. TTUTC knew there was no source of income at the Project.

275. Moreover, upon information and belief, TTUTC received the PwC Reports for DCL and for Turks in or around April 2009, both of which demonstrated that the Project was on the brink of financial collapse and no longer was a viable "going concern."

276. TTUTC knew that Kinay and his cohorts would forward the letter to Purchasers and use it to promote the Project by assuring a continued good relationship with its primary lender, while knowing full well that the Project lacked the money to complete construction.

### Purchasers Paid their Roof-Stage Payments in Reliance on Defendants' Affirmative Misrepresentations and Fraudulent Omissions

277. Kinay told Purchasers that the roofs on the Villas were completed in or around April/May 2009.

278. In reasonable reliance on Kinay's, his associates' and TTUTC's repeated misrepresentations that the Project still was viable and their intentional failure to disclose the truth about its pending collapse, all of the Purchasers made their Roof-stage payments.

### The Project Collapses Following Purchasers' Submission of Roof-Stage Payments

279. Once Purchasers made the Roof-stage payments, construction instantly slowed.

280. Now that Kinay had extracted 80% of the total development contract sum from Purchasers (totaling over $33 million), construction on the Villas also ceased, leaving the Villas as partly-constructed shells with roofs on top, surrounded by undeveloped land.

281. Furthermore, Kinay and his agents also stopped returning Purchasers' calls and emails as soon as they had made their Roof-stage payments.

282. In or around June 2009, DCL fell behind on its payments to several suppliers, as well as to construction and development staff.

283. Nevertheless, in a last ditch attempt to lure more victims into his fraud before it was publicly revealed, Kinay during this same time period sponsored the Mercedes-Benz Polo Challenge, which takes place in Bridgehampton, New York and is attended by numerous celebrities and wealthy individuals.

284. Walker attended the event, and spoke to Steinau at the Dellis Cay tent. Steinau indicated that all was well and failed to disclose that the Project was experiencing problems.

285. Several suppliers filed legal claims against DCL in Summer 2009. One such supplier, TCI Dredging Limited, presented a "Winding-up Petition" against DCL on or about August 27, 2009.

286. Upon information and belief, construction on the Project came to a complete halt by August 2009.

287. Kinay intentionally withheld all of this from Purchasers until after the Project collapsed.

288. Moreover, Kinay and his agents re-approached some Purchasers in a last-ditch attempt to extract more money from them before the fraud was exposed.

289. For instance, just weeks before the Project collapsed, Project CFO Gabe Garcia contacted Galitsyn and offered him Villas and condominiums at fire sale prices.

290. Similarly, Kinay had lunch with Mr. and Mrs. Pictet in Geneva in late-September 2009, and made zero mention of the Project's dire financial condition. At that lunch, Kinay also asked the Mr. and Mrs. Pictet whether they would be interested in investing in his next project, which purportedly involved renovating European castles.

291. During this same time period, in an interview with a Turks and Caicos newspaper, Reckhorn "dismissed" media reports that the Project was in distress, referring to such reports as "gossip, bad-mouthing and damaging." As far as the Dellis Cay developers were concerned, explained Reckhorn, "there were no plans on the cards by TTUTC to pull the funding on the project." He also maintained that the visible lack of continued construction was merely a lull while various retrofitting materials, including windows, were hurricane tested.

292. On October 12, 2009, just a few months after pocketing Purchaser Roof-stage payments totaling over $12 million and despite maintaining throughout the Summer and early-Fall that things were fine, Kinay publically announced the halt of the Project.

293. In a letter to Purchasers on that same day, Kinay stated that as of August 22, 2009, Turks owed a $7.1 million principal and interest payment to TTUTC under the terms of the Loan Agreement and that it was unable to pay the amount due in full.

294. Only after the Project collapsed, in that same letter to Purchasers, did Kinay admit, contrary to his prior misrepresentations, that the Project had sold only $19 million worth of properties between October 2008 and October 2009, versus the $132 million Kinay represented that it sold between July 2007 and September 2008.

295. The few post-September 2008 sales that occurred were finalized in late-2008 and at latest in early-2009. Indeed, Kinay admitted as much after the Project collapsed, confirming that the financial crisis that peaked in the Fall of 2008 caused the "property market in the Caribbean" to come "to a complete halt."

296. This admitted reality stands in sharp contrast to Kinay's and his associates' fraudulent misrepresentations in March and April 2009 to the effect that the Project was "on time

and on budget," that sales activities had "kept their momentum," and that the Project was on the verge of closing $95 million worth of new sales.

## TTUTC Places the Project in Receivership and DCL is Placed in Liquidation

297.    On October 15, 2009, TTUTC announced that, pursuant to the terms of the Loan Agreement, it was placing Turks and Turks Development L.P. (and thus, in effect, the Project) into receivership.  Defendant Tacon is acting as Receiver.

298.    Thus, TTUTC asserted its purported first-position lien on the Project Land, which it always knew it would given that the Project's poor financial state had been obvious to TTUTC since it made the $62 million loan in August 2008.

299.    In addition to its purported first-position lien on the Project Land, TTUTC also received interest payments totaling over $10 million prior to the Project's collapse.

300.    The Turks entities (and thus, the Project Land) remain in receivership to this day.

301.    Upon information and belief, Tacon has attempted to sell the Project Land and continues to do so.

302.    Any sale of the Project Land will be to Purchasers' irreparable detriment, as they currently own residential lots (and partially built Villas) that suddenly would be surrounded by land owned by a third-party with whom they had no relationship and who could develop the land in a way that destroyed the value of Purchasers' investments.

303.    Finally, as a consequence of the presentment of the Winding-up Petition against DCL, certain creditors petitioned the Supreme Court in Turks and Caicos for the appointment of a Provisional Liquidator.  On or about November 13, 2009, the court issued an order appointing defendant Stephen Katz as the Provisional Liquidator for DCL.

**Diversion and Misappropriation of Purchaser Funds**

304.    A substantial percentage of the Purchaser funds that were supposed to be used for the Project instead were funneled to Kinay and Serim and their alter-ego entities. Purchasers only learned of these diversions long after the Project failed.

305.    For instance, Kinay used DCL funds to pay for a $8.1 million home that he purchased in August 2008 on Star Island Drive in Miami Beach (the "Star Island Property")— making him neighbors to the likes of Rosie O'Donnell, Gloria Estefan, Sean "P. Diddy" Combs, Lenny Kravitz and Shaquille O'Neal.

306.    Specifically, DCL made two payments totaling $810,000 (or 10% of the purchase price) to a Florida-based law firm on July 1 and July 24, 2008.

307.    These payments were recorded directly to the Cash account and were not processed through the accounts payable module of QuickBooks. The memo for each payment notes "Star Island."

308.    Kinay used additional funds from the Project to cover the balance between the down payment referenced above and the amount that he borrowed via mortgage.

309.    Kinay also used Project funds to make a $500,000 bribe to then-Turks and Caicos Premier Michael Misick.

310.    Specifically, in July 2009, the Corruption Report was issued by a Commission of Inquiry that had been established approximately one year earlier by the British government to investigate possible government corruption in Turks and Caicos.

311.    The Corruption Report contains several direct adverse references to Kinay, including references to the undisclosed $500,000 payment made on January 9, 2007 by Kinay and Turks Development L.P. to Misick. The Corruption Report concluded that the purported

47

"donation" was anything but, and likely was advanced to facilitate the purchase of land at Joe Grant Cay (another Turks and Caicos island) by a Kinay-led consortium in June 2008.

312.    The Corruption Report alleges that the payment was a *quid pro quo* for the consortium being able to acquire the land at Joe Grant Cay at the "well below market price" of $7.7 million. Upon information and belief, both the $500,000 bribe to Misick and at least part of the $7.7 million used to buy Joe Grant Cay came from Project funds.

313.    DCL also wired $2.5 million to Kinay on July 30, 2008 for no consideration.

314.    DCL also paid the OPC Defendants over $10 million prior to year-end 2008 (and perhaps as much as an additional $5 million in 2009). These payments included millions of dollars where Kinay and Serim were paying themselves for "management services," "consulting" and "design services." They also included a $3 million "finder's fee" for a bond issued in connection with the TTUTC Loan (again Kinay and Serim paying themselves). Upon information and belief, these payments were made without any consideration and were fraudulent conveyances.

315.    DCL also made at least nine payments totaling $546,587 to Halis Sumer between May 22, 2008 and January 21, 2009, purportedly for salary, "profit" advances, and commissions paid on Villa stage payments received by DCL. While Sumer's company Mer owned 50% of DCL when the payments began, those shares were transferred to Turks, who owned the remainder of DCL, in December 2008, less than seven months after Mer acquired them and only one month before the payments from DCL to Sumer ceased. Upon information and belief, these payments to Mer/Sumer were made without any legitimate consideration.

316.    After the project failed, Kinay and his associates stooped to new lows for the sole purpose of lining their own pockets. Specifically, Project assets also were used to purchase a

series of recreational and sport pleasure vehicles, which Kinay subsequently pawned off at significantly reduced prices when the Project was failing.

317.    According to an article posted on the Turks and Caicos Sun Newspaper website on May 28, 2010, "when the Dellis Cay project ran into financial difficulties" a local pawnshop agreed to purchase from it vehicles and watercraft for $100,000.

318.    The inventory purchased by the pawnshop included:  two 2006 Porsche SUVs valued at $50,000 each; two 2007 Jeep Wranglers valued at $20,000 each; two Yamaha all terrain vehicles valued at $7,000 each; two Yamaha jet skis valued at $6,500 each; a Yamaha jet boat valued at $22,000; a 32-foot boat valued at $280,000; and a Mitsubishi SUV valued at $5,000 (a grand total of $474,000).

319.    It is clear from the nature of the vehicles that virtually all of them were for the personal use of Kinay and his associates and were not related in any way to construction of the Project.

320.    Furthermore, the sale of the vehicles at such a greatly-reduced rate suggests that Kinay intended to quickly and without scrutiny sell-off more illiquid assets that had been purchased with Purchasers' construction money in exchange for cash with which he then could disappear, leaving Purchasers with no way to recover their losses.

321.    DCL also made at least 21 payments totaling $424,972 to Air Turks & Caicos between May 22, 2008 and January 21, 2009.  The majority of these charges were for charter flights in the Caribbean, to such locales as Havana and Punta Cana.  Upon information and belief, a substantial percentage of these charges were for flights that were unrelated to development of the Project.

322.    DCL also made eight payments to OC Turizm Services, Inc. ("OC Turizm") in 2008, totaling $216,700.  Serim is the President of OC Turizm.  The transactions with OC Turizm generally were recorded directly to the Cash account.  Upon information and belief, OC Turizm/Serim provided few if any goods or services in return for these payments.

323.    Kinay also created a kickback scheme involving the concrete supplier for the Project, using a company called The Star Lions Ltd. ("Star Lions"), of which he was the sole director.

324.    In or around July 2008, Star Lions entered into a "business referral" contract with Caribbean Concrete & Construction ("Caribbean Concrete") whereby Star Lions (*i.e.*, Kinay) was paid for "referring" DCL to Caribbean Concrete.  As a result of the contract, Caribbean paid Kinay approximately $100,000.  Upon information and belief, Caribbean Concrete in turn recouped the referral fee by passing the cost down to DCL, which meant that it ultimately came out of Purchasers' pockets.

325.    DCL made at least eight payments totaling $585,294 to an entity called Viking Turizm in 2008.  Upon information and belief, Viking Turizm is owned and/or controlled by Serim and/or Kinay.  Upon information and belief, Viking Turizm provided few if any goods or services in return for these payments.

326.    Upon information and belief, Kinay also used DCL to continue to illegally bribe Turks and Caicos government officials beyond his $500,000 bribe to Misick.  Specifically, DCL made 23 payments to the Turks and Caicos Government between May 22, 2008 and January 21, 2009, totaling $426,722.  The payments reference obtaining work permits and labor clearances, but upon information and belief, at least a substantial percentage of these funds were unrelated to such purposes.

327. Kinay also "sold" Residences and Villas to buyers other than Purchasers at substantially reduced (or near-zero) prices in exchange for consideration that did not flow to the Project's benefit. Upon information and belief, the recipients of these sweetheart deals included Kinay's employees, real estate brokers who marketed the Project and the principal of Caribbean Concrete. Not only did such inside deals reduce the Project's inventory without a corollary increase in its revenues, but it also allowed Kinay to artificially inflate the number of Project sales that he represented to Purchasers.

328. Upon information and belief, these known examples are just a few among many instances where Kinay and Serim funneled Purchaser funds intended for the Project in and among the OPC Defendants, the Turks Defendants and DCL such that they eventually lined the pockets of Kinay, Serim and their associates. The total amount of these diversions is in the tens of millions of dollars.

329. For instance, the DCL Provisional Liquidator estimates that over $90 million in cash from Villa and Residence sales went into the Project. Purchasers alone put over $50 million into the Project between their purchase of the residential lots and their submission of stage-payments relating to their development contracts.

330. This contrasts with analyses conducted after the Project failed, which estimated that only $25–30 million worth of construction actually occurred at the Site. These same analyses estimated that only $6.5 million of construction occurred with respect to the Villas in particular, even though the Kinay Defendants had extracted more than $50 million from Purchasers (and many tens of millions more from other Villa purchasers) prior to the Project's collapse.

331. As a result of the fraud committed against them, Purchasers have been damaged in an amount equal to their total investment (collectively, over $50 million), together with amounts expended in financing their purchases.

**Kinay's and Serim's Secreting of Assets from Creditors, Including Purchasers**

332. Soon after the Project failed, Kinay represented to Walker and Connolly in a December 1, 2009 email that the Project's failure had bankrupted him and Serim and that they had no further assets to inject.

333. On January 22, 2010, a Turks and Caicos court issued a so-called "Mareva injunction," against Kinay and Serim, freezing their assets.

334. After learning of the injunction, Kinay almost immediately listed the Star Island Property for sale. He did so knowing that the property was an illiquid asset that would be an easy target for creditors given its location in the U.S. Evidencing his sense of urgency, Kinay sold the property—for approximately $7.25 million—less than a month after first listing it.

335. Techrin Hijazi, who is a real estate broker associated with defendant Avatar, is Kinay's longtime realtor and was the selling agent on Kinay's sale of the Star Island Property.

336. Upon information and belief, Kinay used misappropriated Project funds to pay Avatar substantial broker fees in connection with the sale of his Star Island Property.

337. Just months later, and less than a year after Kinay and Serim closed down the Project and absconded with Purchasers' money, they resurfaced in Turkey in connection with the "launch" of defendant SUU.

338. Indeed, a July 13, 2010 article on www.tourexpi.com is entitled "Dr Cem Kinay reloaded—The new brand 'The SUU.'" The article describes how Kinay "announced the opening with an elite party together with his wife, Marjorie."

339. Kinay's brother, Cenk, is held out as SUU's "CEO and founder" in several other news articles, but upon information and belief Kinay is SUU's actual beneficial owner. In an eerily familiar pitch, Cenk Kinay described SUU in an August 2, 2010 article as a "unique and exclusive hotel experience catering to the upscale travelers."

340. Upon information and belief, a company controlled by Serim and Cenk Kinay manages the sales and marketing for SUU and acquired the right to operate SUU's Turkish property as a hotel.

341. Upon information and belief, Serim and the "reloaded" Kinay are laundering assets through SUU, Kinay's wife and Kinay's brother (collectively, the "Individual Alter-Ego Defendants," and together with the Corporate Alter Ego Defendants, the "Alter-Ego Defendants") in order to circumvent the Mareva injunction and secret funds from their creditors, including Purchasers.

342. Accordingly, any judgment against Kinay and/or Serim also should be enforced jointly and severally against the Individual Alter-Ego Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION

(Fraud against Kinay, Serim and the Alter-Ego Defendants)

343. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

344. Defendants Kinay, Serim and the Corporate Alter-Ego Defendants (collectively, the "Kinay Defendants") made numerous misrepresentations to each of the Plaintiffs for the purpose of inducing all of them to purchase in the first place and then continue to make installment payments. In particular, and as set forth in more detail above, the Kinay Defendants misrepresented, among other things:

- In a June 2007 letter to Purchasers' counsel, in a August 8, 2007 press release, in a March 2008 letter to Purchasers, and in several conversations with Purchasers, that a prominent international contractor—ENKA—had been retained to oversee construction for the Project, when in fact ENKA never was retained and construction instead was overseen by DCL pursuant to a blatantly self-interested contract between the developer and the contractor, which the Kinay Defendants subsequently exploited for their own benefit;

- In a March 2008 letter to Purchasers and orally to Purchasers' counsel around that same time, that the Project had secured up-front financing from Scotiabank sufficient to complete the construction of Phase 1A, when in fact no such financing was secured;

- In an August 2008 press release distributed to Purchasers and again in an October 21, 2008 letter to Purchasers, that the TTUTC Loan was legitimate "construction" finance, when in fact very little of the Loan proceeds were available, much less spent on, construction, and the Loan itself contained onerous terms that virtually guaranteed eventual default such that TTUTC would exercise its purported first-position lien on the island;

- In several letters to Purchasers and their counsel in March and April 2009, and again in telephonic and in-person meetings with Purchasers around that same time, that the Project was in sound financial condition and adequately capitalized, when in fact it was tens of millions of dollars in the hole such that it was guaranteed to fail prior to the completion of construction, as conclusively demonstrated in the PwC reports for DCL and Turks;

- In several letters to Purchasers and their counsel in March and April 2009, and again in telephonic and in-person meetings with Purchasers around that same time, that the revised Plan for the Project was intended to increase "exclusivity," when in fact it was devised to push back the promised construction of the Hotel and other amenities until after Purchasers already had made their Roof-stage payments;

- In several letters to Purchasers and their counsel in March and April 2009, and again in telephonic and in-person meetings with Purchasers around that same time, that construction for the Project was "on time and on budget," when in fact construction efforts focused on the Villa shells to the exclusion of the Hotel and other amenities, in order to extract additional installment payments from Purchasers prior to the Project's collapse; and

- In several letters to Purchasers and their counsel in March and April 2009, and again in telephonic and in-person meetings with Purchasers around that same time, that Project sales were experiencing continued momentum into 2009, when in fact they had come to a complete halt in the second-half of 2008.

345. Plaintiffs reasonably relied upon the Kinay Defendants' misrepresentations in initially purchasing and then continuing to make stage-payments.

346.     The Kinay Defendants' misrepresentations were false and the Kinay Defendants knew them to be false when they were made.

347.     As a direct and proximate result of the Kinay Defendants' fraudulent misrepresentations and omissions, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

348.     The foregoing actions of the Kinay Defendants were wanton, willful and malicious and therefore Plaintiffs also are entitled to an award of punitive damages.

349.     Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A SECOND CAUSE OF ACTION

(Negligent Misrepresentation against Kinay, Serim and the Alter Ego
Defendants)

350.     Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

351.     The Kinay Defendants made numerous representations to Plaintiffs to induce Plaintiffs to purchase in the first place and then continue to make stage-payments under the development contracts.

352.     Plaintiffs reasonably relied upon the Kinay Defendants' representations in initially purchasing and then continuing to make stage-payments under the development contracts.

353.     The foregoing representations, made by the Kinay Defendants to Plaintiffs, were false.

354. The Kinay Defendants had a duty to ensure that any material representations made to Plaintiffs were complete and accurate by virtue of the special relationship between the Plaintiffs and the Kinay Defendants.

355. The Kinay Defendants breached their duty by failing to ensure the accuracy and completeness of those material representations, thereby negligently inducing Plaintiffs to rely on false or incomplete statements.

356. As a direct and proximate result of the Kinay Defendants' negligent misrepresentations, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

357. The foregoing actions of the Kinay Defendants were wanton, willful and malicious and therefore Plaintiffs also are entitled to an award of punitive damages.

358. Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A THIRD CAUSE OF ACTION

(Breach of Fiduciary Duty against Kinay, Serim and the Alter-Ego
Defendants)

359. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

360. Because of the nature of the Project and the transactions between the Kinay Defendants and Plaintiffs, the Kinay Defendants occupied positions of power and special trust over Plaintiffs such that the Kinay Defendants were fiduciaries of Plaintiffs.

361. The Kinay Defendants breached their fiduciary duty to Plaintiffs by misrepresenting material facts, self-dealing and engaging in conduct that was not in the best interest of Plaintiffs.

362. As a direct and proximate result of the Kinay Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

363. The foregoing actions of the Kinay Defendants were wanton, willful and malicious and therefore Plaintiffs also are entitled to an award of punitive damages.

364. Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A FOURTH CAUSE OF ACTION

(Unjust Enrichment against all Defendants other than Avatar)

365. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

366. Defendants wrongly are in possession of money that was acquired through deception, self-dealing and diversion.

367. That money rightfully belongs to Plaintiffs as they entrusted it expecting to get something in return (namely, the successful completion of the Project).

368. Equity and good conscience demand that money be returned to Plaintiffs to avoid unjustly enriching Defendants.

369. As a direct and proximate result of Defendants' unjust possession, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing against Kinay, Serim and the Alter-Ego Defendants)

370.   Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

371.   Plaintiffs had the right and expectation to enjoy the Villas, which were the subject matter of the purchase and sale agreements and development contracts.

372.   The Kinay Defendants destroyed Plaintiffs' ability to enjoy the benefits of the contracts through their misrepresentations, self-dealing and diversion.

373.   As a direct and proximate result of the Kinay Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

374.   Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Conversion against Kinay, Serim and the Alter-Ego Defendants)

375.   Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

376.   The Kinay Defendants now are in possession of specific money that Plaintiffs intended to go toward the construction of their Villas and the Project in general.

377.   Such possession by the Kinay Defendants is substantially interfering with Plaintiffs' right to enjoy the benefits of either that money or the Villas/completed Project.

378.    As a direct and proximate result of the Kinay Defendants' conversion, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

379.    Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A SEVENTH CAUSE OF ACTION

(Negligence against Kinay, Serim and the Alter-Ego Defendants)

380.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

381.    The Kinay Defendants had a duty to use reasonable care in their dealings with Plaintiffs and in meeting their obligations to Plaintiffs.

382.    The Kinay Defendants breached that duty by, among other things, misrepresenting material facts upon which Plaintiffs relied, failing to properly finance the Project, mishandling and diverting Project money, and mortgaging Project assets in such a way that Plaintiffs cannot recover them.

383.    As an actual and proximate result of the Kinay Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

384.    Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Fraud against TTUTC)

385.  Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

386.  A fraud was committed against the Plaintiffs.

387.  TTUTC knew about the fraud and substantially assisted in its perpetration, by, among other things: lending its name to the Project to give it an increased level of legitimacy; making affirmative misrepresentations intended to assist Kinay to induce Purchasers to make further installment payments; assisting Kinay to divert incoming Purchaser funds for his personal use; financing the Project well after due diligence should have revealed that it was likely to fail; and providing a mortgage that liquidated the assets of the fraudster, thereby making it possible to abscond with the Plaintiffs' funds.

388.  As a direct and proximate result of TTUTC's aiding and abetting, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

## AS AND FOR A NINTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty against TTUTC)

389.  Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

390.  A fiduciary of the Plaintiffs breached its duty to them.

391.  TTUTC was aware of the fiduciary duty and of its breach, and substantially assisted in the breach, by, among other things:  lending its name to the Project to give it an increased level of legitimacy; continuing to finance the project well after due diligence should

have revealed that it was likely to fail; and failing to properly audit and account for the activities of the fiduciary such that he was able to divert funds and self-deal without any oversight.

392. As a direct and proximate result of TTUTC's aiding and abetting, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus interest.

## AS AND FOR A TENTH CAUSE OF ACTION

(Fraudulent Conveyance against Kinay, Serim, the Corporate Alter-Ego Defendants and TTUTC)

393. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

394. The conveyance of the Project Land by the Kinay Defendants to TTUTC constitutes a fraudulent conveyance.

395. The conveyance was made with the actual intent to hinder, delay and defraud the Kinay Defendants' present and future creditors, including Plaintiffs.

396. The Kinay Defendants' actual intent to defraud is demonstrated by, among other things, the outrageous terms of the Loan that guaranteed that the borrowers would be unable to make the payments, the fact that the Loan was given when TTUTC knew that the Project was failing, and the fact that all parties to the Loan failed to inform Purchasers of its details.

397. The borrowers under the Loan were insolvent at the time of the conveyance or were rendered insolvent by the conveyance.

398. The Kinay Defendants were engaged in business at the time of the conveyance, through which Plaintiffs were made their creditors, and the conveyance left the Kinay Defendants with unreasonably small capital with which to conduct that business.

399. The Kinay Defendants made the conveyance when they intended to and believed that they would incur debts beyond the borrower's ability to pay as the debts matured.

400. The conveyance was made without fair consideration because the Kinay Defendants did not receive equivalent value in good faith in return from TTUTC.

401. As such, the mortgage of the Project Land constitutes a fraudulent conveyance within the meaning of the Debtor and Creditor Law §§273, 274, 275 and 276.

402. This fraudulent conveyance is avoidable under Debtor and Creditor Law §279.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

(Aiding and Abetting Fraudulent Conveyance against TTUTC)

403. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

404. The mortgaging of the remaining island property constituted a fraudulent conveyance.

405. TTUTC participated in the fraudulent conveyance by granting the mortgage with the knowledge that the contingent loan would not be paid back but that it would have lien priority on the remaining island land once the Project inevitably failed.

406. As a direct and proximate result of TTUTC's aiding and abetting, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

## AS AND FOR A TWELFTH CAUSE OF ACTION

(Equitable Subordination against TTUTC)

407. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

408.    TTUTC engaged in inequitable conduct when it accepted Kinay's mortgage on the Dellis Cay land in repayment for a take-out of Kinay's existing debts, including debts to TTUTC itself.

409.    Equity and good conscience demand that TTUTC's purported lien on the remaining island property be equitably subordinated to the rights of Purchasers as judgment creditors to the same.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION

(Constructive Trust against TTUTC)

410.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

411.    TTUTC is in possession of money that was acquired through its complicity with and substantial assistance in the deception, deceit and self-dealing of Kinay and Serim.

412.    That money rightfully belongs to Plaintiffs as they entrusted it to Kinay, Serim and the Corporate Alter-Ego Defendants expecting to get something in return (namely, the successful completion of the Project).

413.    Equity and good conscience demand that money be held in constructive trust for the benefit of Plaintiffs.

## AS AND FOR AN FOURTEENTH CAUSE OF ACTION

(Aiding and Abetting Fraud against Mandarin)

414.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

415.    A fraud was committed against the Plaintiffs.

416. Mandarin knew about the fraud and substantially assisted in its perpetration, by, among other things: lending its name to the Project to give it an increased level of legitimacy; licensing the use of its name and mark to entice new buyers to purchase and Purchasers to continue making stage payments well after due diligence should have revealed that the Project was likely to fail; and providing a letter parroting misrepresentations while either actually knowing or constructively knowing that those misrepresentations were materially false.

417. As a direct and proximate result of Mandarin's aiding and abetting, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duty against Mandarin)

418. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

419. A fiduciary of the Plaintiffs breached its duty to them.

420. Mandarin was aware of the fiduciary duty and of its breach, and substantially assisted in the breach, by, among other things: lending its name to the Project to give it an increased level of legitimacy; licensing the use of its name and logo to entice new buyers to purchase and Purchasers to continue making stage payments well after due diligence should have revealed that the Project was likely to fail; and providing a letter parroting misrepresentations while either actually knowing or constructively knowing that those misrepresentations were materially false.

421.    As a direct and proximate result of Mandarin's aiding and abetting, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION

(Commercial Bad Faith against TTUTC and Mandarin)

422.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

423.    A scheme or wrongdoing was perpetrated against the Plaintiffs.

424.    TTUTC and Mandarin had actual knowledge of the scheme or wrongdoing that amounts to bad faith.

425.    TTUTC and Mandarin were complicit in the scheme or wrongdoing such that they were acting in confederation with the wrongdoers.

426.    As a direct and proximate result of TTUTC's and Mandarin's commercial bad faith, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION

(Attorneys' Fees against Kinay, Serim, the Alter-Ego Defendants and TTUTC)

427.    Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

428.    Pursuant to Debtor & Creditor Law §276-a:

In an action or special proceeding brought by a creditor . . . to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder delay or defraud either present or future creditors, in which action or special proceeding the creditor...shall recover judgment,

the justice...presiding at the trial shall fix the reasonable attorney's fees of the creditor...in such action...and the creditor...shall have judgment therefore against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment.

429. By virtue of their wrongful acts and conduct described above, the Kinay Defendants and TTUTC fraudulently conveyed the Project Land with the actual intent to hinder, delay and defraud present or future creditors, including Plaintiffs.

430. As such, the Kinay Defendants and TTUTC are liable to Plaintiffs for all such reasonable attorneys' fees, in an amount to be determined at trial.

431. Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION

(Accounting against Kinay, Serim and the Corporate Alter-Ego Defendants)

432. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

433. Because of the nature of the Project and the transaction between the Kinay Defendants and Purchasers, the Kinay Defendants occupied positions of power and special trust over Plaintiffs such that the Kinay Defendants were fiduciaries of Plaintiffs.

434. The Kinay Defendants breached their fiduciary duty to Plaintiffs by misrepresenting material facts, self-dealing and engaging in conduct that was not in the best interests of Plaintiffs.

435. Plaintiffs demand an equitable accounting of the funds entrusted to the Kinay Defendants under the purchase and sale and development contracts.

## AS AND FOR AN NINETEENTH CAUSE OF ACTION

### (Successor Liability against SUU)

436.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

437.    SUU is liable for the liabilities of the Kinay Defendants because a de facto merger of the Corporate Alter-Ego Defendants into SUU has occurred or is about to occur.

438.    Upon information and belief, there is a complete continuity of ownership, management, personnel, and assets between the Corporate Alter-Ego Defendants and SUU in that (i) both are wholly-owned by Kinay or his associates; and (ii) all remaining assets of the Corporate Alter-Ego defendants have been or are about to be transferred to SUU. Furthermore, SUU has continued the Kinay Defendants' luxury-hotel development and marketing business since the transfer of said assets.

439.    Upon information and belief, SUU has assumed all the assets of the Kinay Defendants without consideration, thereby causing the complete cessation of all of the ordinary business of the Kinay Defendants.

440.    Upon information and belief, SUU has assumed all the liabilities of the Kinay Defendants.

441.    As such, the relationship between the Kinay Defendants and SUU is nothing more than a de facto merger.

442.    Therefore, SUU is liable to Plaintiffs in an amount to be determined at trial, but in no event less than $50 million, plus interest.

## AS AND FOR AN TWENTIETH CAUSE OF ACTION

(Violation of N.Y. Gen. Bus. Law § 349 against Kinay, Serim and the Alter-Ego Defendants)

443.    Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

444.    The Kinay Defendants made material representations in New York concerning the financing, construction and management of the Project that had the effect of inducing Plaintiffs to buy into the project.

445.    These representations were consumer-oriented as they were made through the use of promotional materials and events that were available to the general public.

446.    These representations were intentionally misleading, deceptive and false when the Kinay Defendants made them.

447.    By making these representations the Kinay Defendants violated N.Y. Gen. Bus. Law § 349 (the "Consumer Protection Law").

448.    As a direct and proximate result of the Kinay Defendants' violation of the Consumer Protection Law, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $50 million, plus prejudgment interest.

449.    Plaintiffs are entitled to attorney's fees under Section (h) of the Consumer Protection Law.

450.    Any judgment against the Kinay Defendants also should be enforced jointly and severally against each of the Alter-Ego Defendants.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION

(Actual Fraudulent Conveyance against Avatar)

451. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 342 above as if fully set forth herein.

452. The fees paid by the Kinay to Avatar in connection with the sale of the Star Island Property constituted fraudulent conveyances.

453. The conveyances were made with the actual intent to hinder, delay and defraud the Kinay's present and future creditors, including Plaintiffs.

454. Kinay's actual intent to defraud is demonstrated by, among other things, Kinay's knowledge that the Star Island Property was an illiquid asset that would be subject to a judgment lien for any judgment rendered against Kinay, the proximity of the sale of the Star Island Property to the issuance of the Mareva injunction which alerted Kinay that liens were likely to be placed on his assets in the near future, and the urgency with which the house was sold.

455. As such, the fees paid by Kinay for Avatar's broker services are actual fraudulent conveyances within the meaning of the Debtor and Creditor Law § 276.

456. This fraudulent conveyance is avoidable under Debtor and Creditor Law §279.

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

(a) awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus punitive damages in an amount to be determined at trial, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' First Cause of Action;

(b) awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus punitive damages in an amount to be determined at trial, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Second Cause of Action;

(c)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus punitive damages in an amount to be determined at trial, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Third Cause of Action;

(d)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Fourth Cause of Action;

(e)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Fifth Cause of Action;

(f)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Sixth Cause of Action;

(g)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Seventh Cause of Action;

(h)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus punitive damages in an amount to be determined at trial, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Eighth Cause of Action;

(i)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Ninth Cause of Action;

(j)     avoidance of TTUTC's lien on Turks-owned private property on Dellis Cay resulting from the August 2008 Loan on Plaintiffs' Tenth Cause of Action;

(k)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Eleventh Cause of Action;

(l)     equitable subordination of TTUTC's lien on Turks-owned private property on Dellis Cay resulting from the August 2008 Loan on Plaintiffs' Twelfth Cause of Action;

(m)     a constructive trust over money in the possession of TTUTC that rightfully belongs to Plaintiffs on Plaintiffs' Thirteenth Cause of Action;

(n)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Fourteenth Cause of Action;

(o)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, Plaintiffs' Fifteenth Cause of Action;

(p)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Sixteenth Cause of Action;

(q)     all reasonable attorney's fees, in an amount to be determined at trial, on Plaintiffs' Seventeenth Cause of Action;

(r)     an equitable accounting of the funds entrusted to the Kinay Defendants under the purchase and sale and development contracts, on Plaintiffs' Eighteenth Cause of Action;

(s)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Nineteenth Cause of Action;

(t)     awarding Plaintiffs actual damages in an amount to be determined at trial but not less than $50 million, plus prejudgment interest and reasonable attorneys' fees, on Plaintiffs' Twentieth Cause of Action;

(u)     avoidance of the fees paid to Avatar in connection with its brokerage of the sale of the Star Island property on Plaintiffs' Twenty-First Cause of Action;

(v)     awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 28, 2010

PRYOR CASHMAN LLP

By: _____
     Todd E. Soloway
     tsoloway@pryorcashman.com
     Eric D. Sherman
     esherman@pryorcashman.com
     Joshua D. Bernstein
     jdbernstein@pryorcashman.com
     Eric D. Dowell
     edowell@pryorcashman.com
7 Times Square
New York, New York  10036
(212) 421-4100

*Attorneys for Plaintiffs*