15CUCONC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ERIC CONNOLLY, et al.,

4                  Plaintiffs,

5           v.                          11 CV 606 (RJS)

6   CEM KINAY, et al.,

7                  Defendants.

8   ------------------------------x
                                       New York, N.Y.
9                                      May 12, 2011
                                       9:10 a.m.
10
    Before:
11
                    HON. RICHARD J. SULLIVAN
12
                                       District Judge
13
                          APPEARANCES
14
    PRYOR CASHMAN LLP
15       Attorneys for Plaintiffs
    BY:  TODD E. SOLOWAY
16       JOSHUA D. BERNSTEIN
         ERIC D. DOWELL
17
    LOUIS F. BURKE PC
18       Attorneys for Defendants Cem Kinay, Marjorie Kinay,
           Mer Insaat, Halis Sumer
19  BY:  LESLIE S. WYBIRAL

20  THE LAW OFFICE OF SHELDON EISENBERGER
         Attorneys for Defendants Dellis Construction, Stephen Katz
21  BY:  SHELDON EISENBERGER
         ELLIOT HAHN
22
    BAACH ROBINSON & LEWIS PLLC
23       Attorneys for Defendant Receiver William Tacon, TTUTC
    BY:  ERIC LEWIS
24       JOSEPH L. RUBY

25

1    APPEARANCES (Continued)

2    WINSTON & STRAWN LLP
          Attorneys for Defendants Mandarin Oriental Hotel Group,
3            Mandarin Oriental Management
     BY:  MICHAEL S. ELKIN
4         THOMAS P. LANE

5    RIVKIN RADLER, LLP
          Attorneys for Defendant Avatar Real Estate
6    BY:  ERIK K. LINDEMANN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  This is 11 CV 606, Connolly, et al.

2     v. Kinay, et al.

3          For the plaintiffs?

4          MR. SOLOWAY:  Good morning, your Honor.

5          Todd Soloway, Joshua Bernstein and Eric Dowell from

6     Pryor Cashman for the plaintiffs.

7          THE COURT:  You are Mr. Soloway?

8          MR. SOLOWAY:  Yes.

9          THE COURT:  Mr. Bernstein and Mr. Dowell, good

10    morning.

11         For the defendants, why don't we take them in order on

12    the claims, I think is probably the easiest way; is that how

13    you have arranged yourselves?

14         MS. WYBIRAL:  My name is Leslie Wybiral, from the law

15    firm of Louis F. Burke PC, and I represent defendants Dr. Cem

16    Kinay, his wife Marjorie Kinay, Halis Sumer and Mer Insaat.

17         THE COURT:  Ms. Wybiral, good morning.

18         Next is Dellis, Mr. Eisenberger.

19         MR. EISENBERGER:  Good morning, your Honor.

20         Sheldon Eisenberger of the Law Office of Sheldon

21    Eisenberger, Elliot Hahn from my office and we represent

22    Stephen Katz as liquidator for Dellis.

23         THE COURT:  Mr. Eisenberger and Mr. Hahn, good

24    morning.

25         Mr. Hahn, I don't see a notice of appearance from you.

1   If you are going to appear on this matter, file one.

2               MR. EISENBERGER:  Yes.

3               THE COURT:  Next is William Tacon.

4               MR. RUBY:  Your Honor, my name is Joseph L. Ruby.

5               And with me is Eric Lewis and we were here for

6   Mr. Tacon and for Trinidad and Tobago Unit Trust Corporation or

7   TTUTC.

8               THE COURT:  Good morning to each of you.

9               The next defendant who has not yet had anybody stand

10  up is Mandarin Hotel International and other Mandarin entities.

11              MR. ELKIN:  Good morning, your Honor.

12              Mike Elkin.

13              With me is Thomas Lane.  We represent the two Mandarin

14  entities.

15              THE COURT:  Good morning, Mr. Elkin, Mr. Lane.

16              Is that everybody?  No.

17              MR. LINDEMANN:  Good morning, your Honor.

18              My name is Eric Lindemann.  I am from Rivkin Radler

19  LLP for Avatar.

20              THE COURT:  Mr. Lindemann, good morning.

21              I have been collecting paper on this.  I have assorted

22  letters, probably too numerous to go through on the record.  I

23  have letters from virtually all of the defendants and groups of

24  defendants contemplating motions to dismiss for a variety of

25  reasons.  I also have some joint letters and not joint letters

with respect to what the case is about in response to my

standard scheduling order and proposed case management plan.  I

have several of those rather than one joint one which is not

usually the way that it is supposed to work, but I guess this

is not a typical case.  So I think it is worth talking about

the contemplated motions.

I should say at the outset that I have this process.

I have this premotion requirement because I think it is useful,

frankly, to flesh out some of the issues and talk a little bit

about some of the motions before moving straight into briefing.

I think it is not the Court's place to tell anyone

they can't make a motion, so I wouldn't presume to do that.  I

do, on the other hand, think it could be valuable to get the

preliminary arguments and authority that you are relying on, to

review those things, to do some of my own research and to give

you at least a preliminary sense of where I think the issues

fall.  So I am inclined to do that now, and we will see where

that takes us.

A variety of arguments are made with various different

defendants.  Let's start with the contemplated motion to

dismiss for lack of subject matter jurisdiction.  That motion

is contemplated by the Mandarin defendants, what I have been

calling the UTC defendants, the Kinay defendants, the Dellis

defendants and not Avatar -- and maybe I have forgotten

somebody else.

1          This case, the jurisdiction here is based on

2     diversity, according to the complaint, however, I think the law

3     is pretty clear, diversity is lacking where the only parties

4     are foreign entities or where on one side there are citizens

5     and aliens and on the other side there are only aliens.  That

6     is the Second Circuit in one case that recently covered that.

7     It was <u>Universal Licensing Corp v. Paola Del Lungo</u>.  It is 293

8     F.3d at 579.

9          In this case, the defendants argue that the U.S.

10    citizen plaintiffs, the individual plaintiffs, are not real

11    parties in interest, that each U.S. citizen plaintiff actually

12    invested in the development through a Turks and Caicos

13    corporation, and that seems to be borne out by the complaint.

14    I am not sure that that is in dispute or not.  It is very clear

15    under New York law that for a wrong against a corporation, a

16    shareholder has no individual cause of action even though he

17    loses the value of his investment or incurs personal liability

18    in an effort to maintain the solvency of the corporation.  That

19    is Judge Keenan.

20         Judge Batts in another case has noted, it has long

21    been the law of New York and this circuit that a corporation

22    cannot pierce the corporate veil it created for its own

23    protection whenever doing so would be to its own benefit.  You

24    basically cannot pierce your own corporate veil.

25         It seems to me very likely that the individual

1    defendants who would be dismissed out of this case, which would

2    leave only foreign corporations which I think then would

3    destroy diversity jurisdiction in this case, so I think there

4    is a very strong likelihood that on subject matter jurisdiction

5    grounds this case would be dismissed.

6         I am happy to hear from plaintiffs on that, but that

7    is my initial preliminary take on this.  The fact that some

8    individual plaintiffs were injured because they invested moneys

9    into these properties and the fact that they won't have the

10   benefit of using those properties that they hoped to live in or

11   at least vacation in, I don't think, changes the analysis.

12   Honestly, if you create a foreign corporation and that

13   corporation is what invests in the properties, the fact that an

14   individual is the source of the funds, I don't think changes

15   the analysis.

16        Who is going to cover this, Mr. Soloway?

17        MR. SOLOWAY:  Yes.  Thank you, your Honor.

18        And I appreciate your Honor's points.  This is helpful

19   to us.

20        THE COURT:  We will see how helpful it is, but go

21   ahead.

22        MR. SOLOWAY:  Your Honor, we have cited to you, I

23   think in our letters to you about this particular point, that

24   the individual plaintiffs -- each one of these entities --

25   let's just step back.

1          Each one of these entities are single-purpose entities

2     with one shareholder, each of the individuals behind or in

3     conjunction with each one of these companies.  They are in the

4     complaint.  I think that they are actually alleged in the

5     caption -- individual company, individual company.

6          THE COURT:  I get that.

7          MR. SOLOWAY:  The law that we have cited to you in the

8     Krieger case from this district in 2005 standing for the

9     proposition that even where there's a corporate structure,

10    where the individual plaintiff's injury is direct, the fact

11    that the corporation may also be injured --

12         THE COURT:  What is the distinction between the injury

13    to the corporation and the injury to the individual?

14         MR. SOLOWAY:  Here, the fraud would be perpetrated

15    upon the individuals.  They were induced here to enter into

16    these agreements in the first place, which they never would

17    have entered into but for the fraudulent inducements that were

18    engaged in here.  So we have both fraud in the inducement

19    before this agreement ever comes into play, and these entities

20    never would have owned these properties but for that situation,

21    and the fraud was clearly directed at the individuals --

22         THE COURT:  Corporations can only act through

23    individuals.  If IBM bought one of these things and the CEO had

24    hoped to live in one for a vacation, he would have a cause of

25    action?  No.  That is a silly example.  The answer, of course,

15CUCONC

1    is no.

2            The individual plaintiffs created corporations for the

3    purpose of investing.  It is those corporations that are the

4    parties to these arrangements, right?

5            MR. SOLOWAY:  The corporate entities were formed after

6    the misrepresentations -- at least some of the

7    misrepresentations that are at issue here were made.  So these

8    corporate entities would never have come into play except for

9    misrepresentations made and having been induced to enter into

10   the situation.  In fact, your Honor, you will see that these

11   corporate entities bought at various times in the time

12   spectrum.  Some of the individuals will have more

13   misrepresentations just based on the chronology than others.

14           I also wanted to add to your Honor that, in this

15   situation, factually, all of the moneys that were transacted

16   here -- personal moneys, the corporations -- none of these

17   corporations ever had any money.  The moneys were paid

18   directly.  I understand your Honor's point.  This isn't IBM,

19   though.

20           THE COURT:  If I had bought a piece of property and my

21   Aunt Millie gave me the money and the whole thing goes kaput,

22   my Aunt Millie has a cause of action because she is the one who

23   put up the cash?

24           MR. SOLOWAY:  No, your Honor.  That is not what I am

25   saying here.  What I am saying here, we have a single-purpose

1   entity that never would have been formed in the first place.

2   Then it was formed.  And these single-purpose entities are

3   meeting, relying upon a regular basis, the representations that

4   are made by various parties to have them fund personal moneys

5   going forward.  And those individuals were the ones induced by

6   the fraud.  If we were saying here that this was strictly a

7   breach of contract claim, I could see it that way, but this is

8   a fraud directed at people, not just at companies.

9           These entities were formed at closing for the sole

10  purpose of acquiring the land that the individuals were induced

11  to acquire.  So you have individuals who were standing out in

12  the street -- for example, the offering plan that is filed here

13  in New York with the attorney general, that was filed here for

14  this offering plan and is not directed at corporations; it is

15  directed at individuals.  It is a disclosure so that individual

16  people who come before and say, OK, I want to buy.  What am I

17  going to do?  These disclosures were made to them.  These

18  disclosures that were made, even in terms of the marketing and

19  the efforts that were made to have people proceed forward,

20  these were not directed at corporate entities.  These were

21  directed at people who made decisions based upon what occurred

22  here.

23          I fully appreciate your Honor's point about, we set up

24  corporate entities.  These corporate entities were set up for

25  one purpose, to acquire land.  And then from there the

1   misrepresentations were designed specifically towards the

2   people who the money was coming from, who made the decisions

3   based upon these representations.  That is where we stand here.

4   We cite to you the case law standing for the proposition that

5   where the injury to the individual is direct, not through the

6   corporation but direct --

7            THE COURT:  But, again, what makes it direct seems to

8   be that these are single shareholder corporations -- not

9   anything else.

10           MR. SOLOWAY:  I think it is more than that, your

11  Honor.  I appreciate your Honor's point about the Aunt Millie

12  point, but these were not simply situations where individuals

13  after the fact engaged in corporate formalities.  These were

14  very personal interpersonal relationships designed to induce

15  people to enter into agreements in the first place.  They never

16  would have formed these corporations in the first place.  And

17  they never would have gone forward but for these

18  misrepresentations.

19           Then once you are in the chute, yes, you form a

20  corporate entity to own a piece of land, but then who is making

21  the individual payments here?  The staged payments that were

22  tens of millions of dollars that were made here, were all wired

23  and, knowingly -- the people on the other side knew this --

24  were individual payments when they were communicating with

25  them, they were communicating with the individuals directly.

1    Get your money to us.  You have to do this.  And they made all

2    of these representations to the community of villa owners for

3    the purpose of getting them to personally make these payments.

4         These corporate structures were solely for the purpose

5    of owning this land, period.  The individual harm here is real.

6    Each one of these people came out-of-pocket millions and

7    millions of dollars here.

8         And the interrelations, I think your Honor sees from

9    the complaint, we spent a lot of time investigating the history

10   of this before we brought this claim.  The individuals here

11   were specifically targeted to be the ones who would keep this

12   thing going while other people put money in their pockets here.

13        THE COURT:  Let me hear from the defendants here.

14        Thank you, Mr. Soloway.

15        MR. RUBY:  Your Honor, I am Joe Ruby for UTC.

16        I think you raised this point.  If nobody objects, I

17   will start on this issue.  Your Honor, the plaintiffs include

18   the individual defendants and the Turks and Caicos

19   corporations.

20        THE COURT:  Right.

21        MR. RUBY:  All the Turks and Caicos corporations are

22   plaintiffs, and the injury they allege is identical to the

23   injury alleged by the individual defendants, that is, there is

24   no injury alleged by any individual defendant other than the

25   injury that is alleged to have occurred through the

1    corporation.  They are pled precisely together.  And under New

2    York law, that means that the individual has no standing to

3    raise the claim.  If the claim of the individual is identical

4    to the claim of the corporation, then the claim belongs to the

5    corporation, and that is the holding of the <u>Krieger</u> case that

6    plaintiffs just cited to you.

7         THE COURT:  What about when, as Mr. Soloway pointed

8    out, the fraud begins with individuals before the creation of

9    the corporation?  Is that a distinction that matters?

10        MR. RUBY:  I don't think it is, your Honor.

11             First of all, the fact that the fraud, the alleged

12   fraud is directed at the individuals clearly doesn't matter.

13   And <u>Krieger</u> says that, and there are many cases that say that.

14             Now, we don't have any case law on the creation of the

15   corporation, but plaintiffs do not allege that any of the

16   defendants induced them to create these corporations.  They

17   don't allege that the corporations themselves, that the

18   existence of the corporations is an element of the fraud.  In

19   fact, there are plaintiffs who live in Switzerland who didn't

20   use corporations and they are plaintiffs too.  They don't

21   allege anything about how they had to be induced to make a

22   corporation to be defrauded.  That was not part of the alleged

23   scheme.

24             The corporations were set up for -- I don't know what

25   reasons -- reasons having to do with financial interests of the

1  plaintiffs.  They are not alleged to be a part of the scheme.

2  And they are legitimate real corporate entities, and the

3  plaintiffs don't allege any differently.  In fact, the

4  plaintiffs' lawyers are alleging in court that they are legal

5  entities who do have a right to recover the exact same moneys

6  that the individual plaintiffs have a right to recover.  Nobody

7  on this part of the "V" is alleging that there is no remedy.

8  The remedy for the individuals is exactly -- if they can prove

9  their case -- the same as the remedy for the corporations.  In

10  fact, all 21 causes of action are pled on behalf of all 19

11  plaintiffs --

12        THE COURT:  I think that is right.  That is certainly

13  my reading of it.  There is no fraudulent inducement cause of

14  action.  There is a fraud, but there is not a fraudulent

15  inducement claim.

16        MR. SOLOWAY:  I think we have pleadings to that

17  effect.  I don't know if we specified separately fraud in the

18  inducement.

19        MR. RUBY:  There is no fraud in the inducement claim.

20        THE COURT:  Paragraph 344 which is the first cause of

21  action which is styled as "fraud" talks about how certain of

22  the defendants made numerous misrepresentations to each of the

23  plaintiffs for the purpose of inducing all of them to purchase

24  in the first place and then continue to make installment

25  payments.  So it does seem to me that every cause of action is

1    pled with respect to every claim here.

2            You don't disagree with that, do you, Mr. Soloway?

3            MR. SOLOWAY:  No.

4            THE COURT:  Any other defendants want to be heard?

5            Are you done?

6            MR. RUBY:  I am done, your Honor.

7            Thank you.

8            THE COURT:  Any other defendants wish to be heard on

9    that point?

10           Mr. Soloway, anything you want to say in response?

11           MR. SOLOWAY:  I do just want to note that, in terms of

12   inducement, the concept, what would the relief be if you were

13   fraudulently induced to enter into an agreement?  You would be

14   put back to the status quo ante without a corporation, because

15   the corporations were only formed at closing.  So here if there

16   was an inducement, the inducement is clearly to the individual

17   because the corporation never would have existed but for those

18   frauds.

19           THE COURT:  But, again, I don't think you have pled a

20   distinct fraudulent inducement claim.  I suppose that you could

21   amend, but I don't think that you have now.

22           Let's move on to some of the other points raised.

23           Another point raised is lack of personal jurisdiction.

24           Before I get to that one, I think it makes sense to go

25   to forum non conveniens which everybody except, sort of, Avatar

1    makes this argument.  Avatar's is really a motion to transfer

2    to Florida as opposed to a motion to dismiss for forum non

3    conveniens grounds.  But forum non conveniens basically

4    involves a three-step process, and I think most of you are

5    familiar with that.  I am not going to go into it in great

6    detail.

7            The first issue is how much deference to give to

8    plaintiffs' choice of forum.  It seems to me that the deference

9    accorded here is probably the intermediate level of deference

10   at best.

11           The second test is whether there is an adequate

12   alternative forum.  And it seems to me that Turks and Caicos is

13   an adequate alternative forum.  Certainly courts in this

14   district and elsewhere have found it to be an adequate forum.

15   It is not a corrupt sham of a justice system.  I think it is

16   the case that the defendants will submit to service of process

17   in Turks and Caicos.

18           I want to make sure that is true of Avatar.

19           Is it?

20           MR. LINDEMANN:  I believe so.

21           THE COURT:  So then you get to sort of balancing the

22   public and private interests here.  And although there seems to

23   be some dispute as to exactly what witnesses and what evidence

24   is where, it does seem to me that Turks and Caicos has the

25   better of the argument.  This is where the property is.  This

1  is where virtually all of the defendants are.  This is where

2  most of the plaintiffs are, even if you include the individual

3  plaintiffs, in other words, if I don't dismiss them.  It seems

4  to me that Turks and Caicos has a pretty strong interest in

5  adjudicating these issues.  Unless there is some good reason

6  not to be there, I think I would be likely to grant the motion

7  on forum non conveniens grounds, even if I didn't dismiss on

8  subject matter jurisdiction grounds.

9        I think that is sort of worth sharing with you,

10  although there may be some other facts here.  A motion like

11  this often relies on some things that are outside of the

12  pleading.

13        Mr. Soloway, I am happy to hear you on forum non

14  conveniens as well, unless you are dividing up.

15        MR. SOLOWAY:  No.  You will hear from me.

16        Your Honor, I think we pulled out recently the

17  Coca-Cola decision that your Honor had issued.  There you had

18  Guatemalan parties, Guatemalan injuries -- everyone was there

19  and coming here to assert claims.

20        Here, if there is one place where the majority of

21  people actually really are, it is here.

22        THE COURT:  Why do you say that?

23        MR. SOLOWAY:  I understand the corporate structures,

24  your Honor, but the individuals -- I can run through the list,

25  I think, although it is not fully set forth right now, at least

1   a third of them actually live here and more of them have homes

2   here.  The defendants, I don't think, with the exception of the

3   corporate structural names, are not in Turks and Caicos.  No

4   one is in Turks and Caicos.

5          THE COURT:  There are a lot of Delaware corporations

6   that are not in Delaware.

7          MR. SOLOWAY:  I understand that, but as a practical

8   matter, no one is in Turks and Caicos.

9          THE COURT:  Where is everyone then?

10          MR. SOLOWAY:  Let's go through it.

11          The plaintiff Mr. Connolly lives in New York.

12          Mr. Razek lives in Ohio, but is in New York and has an

13   apartment in New York.

14          Mr. Walker lives in New York.

15          Mr. Galitsyn is a Russian citizen, but I know he is

16   back and forth.

17          Mr. Isaias is an Ecuadorian citizen.

18          Mr. and Mrs. Pictet, I believe, are Swiss.

19          Mr. Singh is British.

20          And Mr. Watts is from Texas, but he is back and forth.

21          THE COURT:  What about Michael Topr?

22          MR. SOLOWAY:  Mr. Topr is of Russian origin, but lives

23   in New York full-time.

24          THE COURT:  Mr. Kinay?

25          MR. SOLOWAY:  Mr. Kinay is in Florida, has multiple

Florida addresses.  We served him in Florida.

THE COURT:  Keep going.

MR. SOLOWAY:  Mr. Serim is Turkish.  I believe he lives in Turkey.  I don't know for sure.

O Property Collection USA was served in Florida.

By the way, all of the O Property entities have not appeared nor have the Turks entities, the Turks General Partners, the Turks Holding, the Turks Limited -- none of them have appeared.  And all of those, as we have alleged in our complaint, are merely shell entities that Mr. Kinay and his partners exercised full dominion and control over.

We have the receivership there.

Marjorie Kinay is Florida.

Cenk Kinay is Turkey.

The SUU Hotels is a Turkish entity.  I know they own a hotel in Costa Rica.

The UTC, your Honor, without being presumptuous, I assume we will deal with the personal jurisdiction arguments there.  They have funds and other entities that do business in New York.

Mandarin Oriental, although they have alleged some type of lack of personal jurisdiction, all we have to do is walk over to Columbus Circle and look up.

And then we have Mer Insaat and Halis Sumer are Turkish citizens, I believe.

1          And Avatar is a Florida LLC.

2          As a practical matter, none of them are in Turks and

3   Caicos, and the majority of the plaintiffs -- not the majority,

4   a real number of the plaintiffs reside and live here or have

5   homes here.

6          THE COURT:  You are talking about the individual

7   plaintiffs?

8          MR. SOLOWAY:  Yes, your Honor.

9          MR. EISENBERGER:  Your Honor, Dellis was skipped over.

10          MR. SOLOWAY:  I'm sorry.  I didn't mean to

11   discriminate.

12          MR. EISENBERGER:  They are, I believe in Turks and

13   Caicos.

14          THE COURT:  That is a different issue with respect to

15   the bankruptcy that we will come to.

16          MS. WYBIRAL:  May I be heard?

17          THE COURT:  Yes.

18          MS. WYBIRAL:  Turks Limited was incorporated in the

19   Turks and Caicos June 10, 2005 and have registered offices in

20   Providenciales.

21          Dellis Construction was incorporated in Turks on

22   February 9, 2007.

23          The reason that the receivership is in Turks and

24   Caicos is because of Turks Limited and the Turks Development,

25   which is exactly the reason why Turks and Caicos would have

1 more of a compelling interest in adjudicating this case because

2 I believe at least two cases -- three, actually -- have already

3 been brought there concerning this whole project for different

4 reasons but, nevertheless, there is a pool of litigation

5 concerning Dellis Cay.

6 THE COURT: All right. Any other defendants wish to

7 be heard with respect to forum non conveniens?

8 MR. ELKIN: Yes, your Honor.

9 Mike Elkin, Winston & Strawn for the Mandarin

10 defendants.

11 THE COURT: Wait. I believe I misidentified you.

12 You are?

13 MR. RUBY: I am Joseph L. Ruby.

14 THE COURT: Mr. Ruby, I referred to you as Mr. Elkin

15 before. I am sorry about that.

16 MR. ELKIN: It is a compliment, your Honor.

17 Very briefly, I appreciate Mr. Soloway's comment about

18 you can go to Columbus Circle and see Mandarin, but that is a

19 very facile approach here.

20 Let me just suggest, with respect to the two Mandarin

21 entities here, Mandarin Oriental Management BVI Limited is a

22 company incorporated under the Cayman Islands and it only does

23 business with respect to the Caribbean Islands. It has no

24 operations or activities here in the United States whatsoever.

25 The other entity which we believe was wrongfully sued, wasn't a

1    signatory to the management agreement.  The second one, the

2    Mandarin Oriental Hotel Group International Limited is a

3    company that has no business or activities here whatsoever.  It

4    has to do with some foreign operational company within the

5    Mandarin Hotel Group.  Again, there is no Mandarin-related

6    entity here that does any work for it.  It is just an improper

7    party.  The second party is based in Hong Kong and has no

8    operations or activity in the United States.

9                    MR. RUBY:  Your Honor, may I?

10                   THE COURT:  Yes.

11                   MR. RUBY:  Your Honor, for UTC and Mr. Tacon, first of

12   all, we would contend that the proper level of deference is

13   low.  There were only three New York domiciled plaintiffs.  We

14   don't think they are proper plaintiffs.  The great majority of

15   plaintiffs are not New York domiciliaries.  And the reason we

16   are here, we think, is forum shopping.  When parties forum

17   shop, their choice is not entitled --

18                   THE COURT:  I understand.  What I said was that I

19   thought it was, at best, intermediate.  So I will stand by

20   that.

21                   MR. RUBY:  Secondly, your Honor, there was a

22   representation made about UTC, and I would like to clear it up.

23                   Plaintiffs have made a mistake.  They allege in the

24   complaint that UTC has a subsidiary company that is

25   incorporated in New York with a mailing address in New York,

1    and that is a mistake.  The company that they refer to, the UTC

2    North America Fund Incorporated is incorporated in Maryland and

3    has its U.S. mailing address in the state of Wisconsin.  It has

4    no New York mailing address.  It did, about 12 years ago, but

5    it doesn't now.  It has never been incorporated in the State of

6    New York.

7              THE COURT:  It has no offices or anything?

8              MR. RUBY:  No offices, no employees, no agents, no

9    phone numbers.  It doesn't actively do business in the State of

10   New York.

11             If a New York resident wants to invest in the fund, it

12   can do so, but it has to contact UTC through its administrator

13   in Milwaukee, Wisconsin.

14             So that is just an error.  So we think that that goes

15   more to the personal jurisdiction than it does to forum non,

16   but there was a representation made to your Honor concerning

17   forum non, so I am jumping to that issue.

18             THE COURT:  Well, there is some overlap between the

19   two issues.

20             MR. RUBY:  Yes, indeed, there is.

21             With respect to the factors that are involved, your

22   Honor, all of these Turks and Caicos companies which have not

23   appeared have been sued.  And if plaintiffs want to reconfigure

24   their case, they can do that.  But as long as they are suing

25   them and those entities have decided not to appear --

1    presumably, because they don't think there is jurisdiction over

2    them here, which is their right -- they should be taken into

3    account in the forum non analysis.

4            The complaint alleges that there was a very

5    substantial well organized conspiracy involving a great many

6    people, involving corporations in the Turks and Caicos Islands,

7    incorporated under Turks and Caicos law to defraud people from

8    around the world, most of whom are not in New York, by creating

9    an investment opportunity in the Turks and Caicos Island to

10   trap these unwary wealthy people and deprive them of their

11   money.  And that is an issue of great importance to the

12   government of Turks and Caicos.  It is an issue that has

13   created a commission of inquiry there.  There are both civil

14   and criminal investigations going on in Turks and Caicos right

15   now into this transaction.

16           Our client, UTC, has sued and won a money judgment of

17   $85 million against Mr. Kinay and Mr. Serim in the supreme

18   court of the Turks and Caicos Island.

19           We have a freezing order from the supreme court for

20   the Turks and Caicos Island over the assets of Mr. Serim and

21   Mr. Kinay

22           This is a Turks and Caicos Island centered dispute.

23   It is a matter of great public importance in the Turks and

24   Caicos Island.  It is a matter of no importance to the State of

25   New York.  If New Yorkers decide to go to a foreign country and

1    incorporate corporations there and make investments through

2    those corporations there, that is certainly their right, but it

3    doesn't mean that the State of New York continues to exercise

4    its protection over them when they decide to do that.  This is

5    a case perfectly adequate for the courts in Turks and Caicos

6    which are far less busy than this Court.

7              THE COURT:  I will vouch for that.

8              MR. RUBY:  It is a case that can be handled there by

9    very competent jurists --

10             THE COURT:  More competent than here?

11             MR. RUBY:  Your Honor, I am only reporting what I have

12   been told, that they are very competent.  I have not tried

13   inquired, but we do believe that's where the case belongs.

14             THE COURT:  Clearly, that's what you believe and many

15   of the points are ones that I have touched upon.  And as I

16   said, I do think that there are strong arguments to be made

17   there and I am inclined, at least at this point, to grant the

18   motion on forum non conveniens grounds but, Mr. Soloway, I am

19   not going to shut you down.

20             MR. SOLOWAY:  What happens when the reverse happens,

21   when a developer in Turks and Caicos comes and files an

22   offering plan in the State of New York to market property to

23   New Yorkers and registers with the attorney general of the

24   State of New York an offering plan and then proceeds to have

25   marketing events in South Hampton, in New York City, multiple

1    events and comes into the jurisdiction to sell, and people rely

2    upon those representations and put their money down, millions

3    of dollars?  We should stand behind the formality and say, they

4    decided to go there.  I am really sorry.  This should all be

5    heard in Turks and Caicos.  These are New York people --

6              THE COURT:  Some of them.

7              MR. SOLOWAY:  Some of them.  Your Honor, we frequently

8    have cases where there are multiple parties from lots of

9    places.  That is not unusual.

10             THE COURT:  I understand there is an analysis to be

11   made here.  You are arguing that New York is really the center

12   of the locus of this, what is alleged in the complaint as a

13   fraudulent scheme and, obviously, Mr. Ruby is taking a very

14   different view and has asserted certain facts that are not part

15   of the complaint and are not part of the record at this point.

16             Do you dispute that this scheme is being investigated

17   in Turks and Caicos?

18             MR. SOLOWAY:  There is no dispute about that, and that

19   scheme is also being investigated here.

20             THE COURT:  By the New York attorney general?

21             MR. SOLOWAY:  I don't know everybody, but I have

22   received a number of phone calls from a lot of people about

23   this matter.  So there are frequently multiple locations where

24   a case can be brought.  That doesn't mean it doesn't get

25   brought in one of them.

1          THE COURT:  I guess that the issue is why should it be

2     brought here and not in the Turks and Caicos.  And, typically,

3     the analysis turns on the inadequacy of the alternative forum,

4     but you are not suggesting that, are you?

5          MR. SOLOWAY:  I am not necessarily suggesting it is an

6     inadequate forum.  What I am saying to you, your Honor, we have

7     a right to bring this case here.  They came here to sell.

8          THE COURT:  It is not about a right to bring a case.

9     It is about not whether one has a right to bring a case; it is

10    whether a case should properly be in one jurisdiction as

11    opposed to another.  Under forum non conveniens, that is the

12    issue.

13         MR. SOLOWAY:  Sure.  On the forum non conveniens

14    point, there certainly is no difficulty -- this is not a

15    situation --

16         THE COURT:  A large number of the defendants are not

17    here now, so there is some difficulty, right?

18         MR. SOLOWAY:  All of these entities are Kinay

19    entities, and I can show you that in motion papers that all of

20    these entities were controlled by Kinay and Mr. Serim.  They

21    were the shareholders.  So they stand before you and say, well,

22    they probably are not here because they have the right to say

23    there is no jurisdiction, but they stand here in one capacity

24    but not in another.

25         THE COURT:  You named a bunch of defendants and many

1    of them are not here.  If you are telling me that they are just

2    shells that don't matter, I guess that is worth knowing, but it

3    is not clear to me from the complaint whether that is true.

4             MR. SOLOWAY:  Your Honor, this is a point for

5    lawyering that we frequently have to discuss.  Is everybody

6    actually necessary here?  There are some that may be and some

7    that may not be, but we have a broad fraud here and we have

8    alleged it, I respectfully submit, with great particularity --

9             THE COURT:  I am not saying it should be dismissed for

10   lack of particularity.  I am not suggesting that.

11            MR. SOLOWAY:  My point being that you have multiple

12   parties here controlled by the same people who are perpetrating

13   this fraud.  They are using these entities to funnel money back

14   and forth to each other.  There are multiple instances in which

15   these various corporate entities are used by the individuals to

16   shuttle money back and forth to themselves.

17            A great example is the Avatar situation.  Dellis

18   Construction Limited paid $8 million to buy an apartment in

19   Miami.  Then the injunction is issued out of the Turks and

20   Caicos.  What happens?  That week or within a month or so after

21   that, the apartment is sold by Dr. Kinay for under market

22   value, liquidating an illiquid asset, and the money is

23   distributed wherever.

24            So these companies were all used in various ways and

25   we have the details to back it up to show you that it has

1    actually happened.  And who does it affect?  It affects these

2    people here who were marketed these apartments under an

3    offering plan filed with the New York State attorney general's

4    office.

5         I understand your Honor's comment about what the

6    intermediate level of deference given to where the plaintiffs

7    chose it, given the level of contacts that this project was

8    brought here to New York for sale, I respectfully submit, and

9    given the fact that where everybody actually is --

10        THE COURT:  Where everybody actually is?  You don't

11   mean --

12        MR. SOLOWAY:  Where a variety of people are.

13        THE COURT:  Where some people are.  You can't say

14   everybody when you mean some.  I understand your point, but

15   don't overstate it.

16        MR. SOLOWAY:  I appreciate that, your Honor.

17        What is the point of filing, for example, an offering

18   plan with the attorney general's office?  It is to insure that

19   New Yorkers -- because it is a state statute, the Martin Act --

20   are protected, not anyone else.  And some of these people

21   bought as New Yorkers, and they were entitled to that

22   protection.

23        And the marketing events that were focused here -- I

24   think we have alleged in the complaint, there were multiple

25   statements by Kinay and his representatives that New York is

1    the focus of this marketing event, of the marketing of this

2    property.  It is a very limited number of lots and apartments

3    that are available on Dellis Cay.  I have been there.  So this

4    was focused on New Yorkers here.  They were looking for us.

5         I respectfully submit, on everything I told your

6    Honor, that it is designed to insure that New York citizens are

7    protected, and that's why we are here.

8         THE COURT:  I understand the point.  It is really an

9    issue of balancing the forum non conveniens.

10         MS. WYBIRAL:  May I be heard again?

11         THE COURT:  You may.

12         MS. WYBIRAL:  First of all, as far as the sale of the

13   Miami apartment and the money going who knows where, the money

14   actually went to pay off the mortgage on the property, and the

15   balance of it was sent to the Turks and Caicos lawyers,

16   pursuant to a court order, to be put under the control of the

17   receiver for distribution.  So that's exactly where it went --

18   again, back to the Turks and Caicos.

19         I know about this plan filed in New York and,

20   supposedly, New Yorkers were targeted.  But they formed Turks

21   and Caicos corporations, each of which entered into two

22   separate agreements, a lot sale agreement and then a villa

23   construction agreement.  Each of those agreements had a

24   jurisdiction clause stating that this agreement is made and

25   shall be performed in the Turks and Caicos Islands.  The

15CUCONC

1    parties consent to the exclusive jurisdiction of the supreme

2    court of the Turks and Caicos Island in respect of all matters

3    arising.

4         This clause was freely negotiated between the parties'

5    lawyers.  Everybody was represented here.  And there's no

6    reason for this Court to disturb the intent and agreement

7    between the parties to the operative contracts that any matters

8    that are disputed would be brought before the supreme court of

9    the Turks and Caicos.

10        THE COURT:  I am certainly familiar with the forum

11   selection clause.  It is choice of law clause, Turks and Caicos

12   law under the contract, right?

13        MS. WYBIRAL:  Under both of them, yes.

14        THE COURT:  But there is no breach of contract claim,

15   is there?

16        MR. SOLOWAY:  That's correct, your Honor.

17        THE COURT:  So your argument is that there is a broad

18   clause that includes anything, whether styled as contract or

19   tort pertaining to the property?

20        MS. WYBIRAL:  They may not have alleged a breach of

21   contract claim, that doesn't vitiate the contracts from being

22   the operative agreements that they are, in other words,

23   underlying this entire action.

24        THE COURT:  Anybody else want to be heard with respect

25   to forum non conveniens?

1      Related to that, I suppose, is the lack of personal

2  jurisdiction and that one -- I think that we have covered some

3  of the points.  There seem to be disputed facts with respect to

4  what exactly went on in New York and where companies are.  I

5  don't know that that is something that I can resolve right now.

6  If there were to be motions, then I gather there would be

7  submissions and affidavits and other evidence that would be

8  made to enhance the record with respect to the issues

9  pertaining to personal jurisdiction.

10      Anybody want to be heard briefly -- I have something

11  else at 10 -- anything that they would like to say on lack of

12  personal jurisdiction that has not already at least been

13  touched upon in the other discussions we have had this morning?

14      MS. WYBIRAL:  Yes, your Honor.  I would just like to

15  point out another mistake in the plaintiffs' complaint, and

16  that is the fact that my client Dr. Kinay is not and never has

17  been a U.S. citizen.  He has Turkish citizenship and Austrian

18  citizenship and that is where he resides.

19      THE COURT:  You dispute that he is a Florida resident?

20      MS. WYBIRAL:  He has never been a Florida resident.

21  Did you say that, Mr. Soloway?  You said you served him in

22  Florida?

23      MR. SOLOWAY:  Yes.  We served him in Florida and his

24  wife in Florida.  We have multiple addresses for them in

25  Florida, and we have evidence that they actually owned the

1  property in Florida too.

2         THE COURT:  So there seems to be a dispute as to where

3  he resides which I cannot resolve now, but good to know.

4         MR. SOLOWAY:  I do want to mention one point about the

5  UTC, your Honor, in terms of their saying that there was a

6  "mistake" in our pleadings relating to the business that the

7  fund entities do in New York.

8         One week before they submitted the letter to your

9  Honor, they changed their SEC filing to take out a New York

10  address and to substitute in, I think, a Maryland address in

11  lieu thereof.

12         THE COURT:  What should I infer from that?

13         MR. SOLOWAY:  Particularly at this point, there is

14  certainly an issue about whether or not they are jerry-rigging

15  their jurisdictional argument to come to the Court and say, we

16  have no address here, we don't do anything here.  The test that

17  your Honor set forth, I believe, in the Gem case that your

18  Honor had about a year and a half ago --

19         THE COURT:  You are reading all of my cases.

20         MR. SOLOWAY:  I am, and I am going to keep going.  I

21  am not stopping.

22         But in that case your Honor talked about the mere

23  department test or an agency test for terms of jurisdiction

24  where you have a subsidiary doing business in New York.

25         And we have substantial evidence that:

1        A) There was control by the UTC over its U.S.

2   subsidiary that does business in New York, that has banking

3   relationships in New York with specific banks.

4        We have multiple items of documentary evidence to

5   support their doing business in New York, including with

6   securities agencies with respect to their performance of

7   business in New York.

8        And they are fully controlled by the UTC.  Two-thirds

9   of their assets are UTC assets.

10       The board of directors are overlapping between the two

11  companies.

12       And they act at the behest of UTC for its benefit.

13       We would argue to your Honor -- this is for personal

14  jurisdiction purposes -- that you can have jurisdiction of a

15  parent through the business of its subsidiaries under this mere

16  department or agency test.  And we respectfully submit, your

17  Honor, that we would meet that standard.

18       THE COURT:  But clearly what Mr. Ruby or Mr. Elkin --

19  I forget.

20       Mr. Ruby, you said this?

21       MR. RUBY:  Yes.

22       THE COURT:  He is disputing that there is any New York

23  connection, and the change in the SEC filing is the first I

24  have heard is what you mentioned, could be consistent with you

25  called their attention to the fact that they had old

1    information in their SEC filing.

2              MR. SOLOWAY:  Your Honor, in that regard --

3              THE COURT:  I am not going to resolve that today.

4              MR. SOLOWAY:  That's my next question.  On these

5    topics where we have jurisdictional issues, do we get discovery

6    on those topics?  It is your Honor's courtroom, I don't want to

7    be presumptuous, but we would like to get going with discovery.

8    That's what we would like to do here.

9              One of the items of dispute on the discovery issues

10   was that we want discovery to go forward while these motions

11   are pending and they don't, particularly on these issues where

12   we have jurisdictional issues, etc.  Again, without being

13   presumptuous, we sort of laid that out there for you.

14             THE COURT:  Before we get to that, I want to talk

15   about the bankruptcy issue.

16             Dellis, you have been very quiet, but Dellis contends

17   that it is currently engaged in a liquidation in Turks and

18   Caicos, and because under Turks and Caicos law, actions against

19   companies in bankruptcy may not proceed without leave of the

20   court, much like here, that the case against it should be

21   dismissed.

22             There certainly is good authority for U.S. courts

23   extending deference to foreign bankruptcy proceedings.  That is

24   another Judge Keenan case, Sea Trade v. FleetBoston.  So it

25   does seem to me that there is a strong argument there that this

1    Court should accord deference to the foreign bankruptcy

2    proceeding.

3            Plaintiffs argue that under Turks and Caicos law,

4    actions involving companies in bankruptcy may continue as long

5    as the liquidator seeks leave of the Turks and Caicos court.

6    They contend, therefore, that Dellis should not be allowed to

7    benefit from its failure to seek that leave in Turks and

8    Caicos.  The protection of the bankruptcy laws exist for a

9    reason.  If plaintiffs were correct, then it would mean

10   basically that the bankruptcy protections would be virtually

11   gutted in every case, it seems.

12           I guess what I am saying is that, I am inclined to

13   show deference to the Turks and Caicos bankruptcy.

14           Mr. Soloway, do you want to be heard on that?

15           MR. SOLOWAY:  Mr. Bernstein, if that's OK?

16           THE COURT:  Fine.

17           MR. BERNSTEIN:  Your Honor, it is our understanding

18   from Turks and Caicos practitioners, that not Dellis

19   Construction, but the liquidator of Dellis Construction,

20   Stephen Katz, who was appointed by the courts down there, is

21   the only person with standing to request permission to allow

22   the suit to go forward outside of Turks and Caicos.  And it is

23   our understanding that these applications are routinely granted

24   and that liquidators, in their position as liquidators -- not

25   as the company -- routinely make those applications, and we

1  have spoken to Mr. Katz about that.

2          THE COURT:  Is Mr. Katz going to make that application

3  or not?

4          MR. HAHN:  No, your Honor.

5          Do you want to hear from us?

6          THE COURT:  Sure.

7          MR. HAHN:  Mr. Katz, first of all, is aware of no such

8  requirement that he is the one that has to seek leave from the

9  Turks and Caicos court.  I note that plaintiff has not cited

10 any authority for that proposition, but states this is their

11 understanding.  Mr. Katz does not share that understanding.

12          In any event, even if plaintiffs were correct -- and

13 we certainly don't believe that they are -- Mr. Katz has

14 already made clear his intention to this Court and to plaintiff

15 that he has no intention of seeking leave.

16          The fact of the matter is that plaintiffs have not

17 complied with the requirements of the Turks and Caicos court

18 and, until they do so and until somebody seeks leave -- and Mr.

19 Katz doesn't believe he needs to do that and he doesn't intend

20 to do that -- the state provisions apply and this case should

21 be dismissed --

22          THE COURT:  -- with respect to Dellis?

23          MR. HAHN:  Correct.

24          And in the event that your Honor's orders for

25 discovery to move forward while these motions are pending, we

1  would request that we be exempted from participating in

2  discovery because we think that that would violate the Turks

3  and Caicos statute.

4      THE COURT:  I am not sure I could dismiss.  I could

5  stay, I suppose.

6      MR. HAHN:  I think there is case law going both ways,

7  you could dismiss or stay.

8      THE COURT:  I have told you sort of what my

9  preliminary thinking is on these things.  I reserve the right

10  to change my mind, of course.  But I do think it is worth

11  sharing with you because I think plaintiffs should decide

12  whether it is worth having months of briefing and then months

13  of me trying to make sense of it all and then writing a pretty

14  opinion, or whether it makes sense just to do this in Turks and

15  Caicos where there seems like there is already a head start and

16  a head of steam that has been built up.

17      That may be something, Mr. Soloway, that you want to

18  consider with your clients in light of what we have discussed

19  today.  Get a copy of the transcript, if you want.  So I will

20  let you think about that.

21      I am not inclined to have discovery go forward with

22  respect -- I am really not inclined to have any discovery going

23  forward.  It seems to me, I don't need additional discovery on

24  the subject matter jurisdiction.  I am not sure I really need

25  much discovery in relation to forum non conveniens.  The

1  personal jurisdiction may require a little more, which is why I

2  focused on it less.

3      But I am inclined, frankly, if you want to make the

4  motion, I would stay discovery.  There needs to be some limited

5  discovery, then I think that I would ask plaintiffs to identify

6  that in their response papers.  But I really don't think I need

7  to do too much.  That's my thinking.  It does seem to me that

8  it may make sense for the parties to decide whether they want

9  to spend a lot of time and a lot of energy on briefing or

10  whether it makes sense to go to Turks and Caicos and see what

11  is going on down there.

12      So Mr. Soloway, what do you think?  Back in ten days

13  or two weeks?

14      MR. SOLOWAY:  Sure.

15      THE COURT:  That is enough time?

16      MR. SOLOWAY:  We don't want to wait on these.

17      THE COURT:  I will give you two weeks, but you can get

18  back to me sooner if you want.

19      MR. SOLOWAY:  That would be great.  I appreciate that.

20      THE COURT:  Assuming that plaintiffs want to continue

21  here, then defendants, it is your motion.  So how long do you

22  think it is going to take you to make submissions?

23      MS. WYBIRAL:  For the Kinay defendants, Halis Sumer

24  and Mer Insaat, could we have 30 days after the plaintiffs

25  respond to the Court to file the motion?

1    THE COURT:  Let me hear from everybody else.

2    30 days after Mr. Soloway gets back to you?

3    MR. ELKIN:  Yes.  For the Mandarin defendants, that

4    would be fine, your Honor.

5    THE COURT:  Nobody is opposed to that?

6    Mr. Soloway, are you OK with that?  It is a somewhat

7    complicated motion.

8    MR. SOLOWAY:  I am fine with that.  My issue in

9    response to that is, I don't know how far in the scheduling we

10   are going to go here.  It is us against the world type of

11   thing, so we might want to ask the Court to allow us to stagger

12   our responses, just so that we can manage it.  We will be

13   facing probably five or six motions if we go in that direction.

14   THE COURT:  Or I give you more time.  I give them 30

15   days.  I would give you 45 or even 60, if you think --

16   MR. SOLOWAY:  Can we address that after we get back to

17   you?

18   THE COURT:  You talk to your clients.  See what they

19   want to do.  Confer with your adversaries.  To the extent you

20   want to go forward, why don't you collectively propose then a

21   briefing schedule.  If you cannot agree, just tell me where you

22   don't agree in your letter and then I will resolve it.

23   MR. SOLOWAY:  I will have you know, that we have

24   worked well with everybody.

25   THE COURT:  Let me just commend everyone on your

15CUCONC

professionalism and the quality of what you have submitted.  It

has been interesting, and today is no different and those who

spoke did a good job.

        Let's do that.  Two weeks from today puts us at the

26th of May.  By the 26th of May, let me ask Mr. Soloway to

submit a letter indicating to me what the plaintiffs plan to do

in terms of going forward or whether they should voluntarily

dismiss without prejudice.  And if you want to go forward, you

can propose on behalf of all parties a briefing schedule.  To

the extent there are disagreements just lay it out in the

letter.  Just show it to them before you submit it.

        MR. SOLOWAY:  Thank you, your Honor.

        THE COURT:  Anything else.

        MR. LINDEMANN:  I think I may have misspoken before

when you said would Avatar consent to jurisdiction.  I don't

believe they would, but Avatar is in this case due to a real

estate transaction that occurred in Florida.

        I don't believe that they have any ties to Dellis Cay

or anything like that, so I don't believe they would consent to

jurisdiction in Turks and Caicos.

        Just one more thing, your Honor, in my March 31st

letter, we were unaware at the time that the property in

Florida was actually sold pursuant to a judgment -- to

partially satisfy a judgment that was issued in the Turks and

Caicos.  So we would also like to be able to argue to

15CUCONC

1  plaintiffs' cause of action as there is no fraud there where

2  the Turks and Caicos order and receiver directed the sale of

3  the property, and they are just seeking the real estate

4  commission.

5           THE COURT:  12(b)(6).

6           MR. LINDEMANN:  Yes.

7           THE COURT:  That's fine.  What is one more?

8           So let's stick with that schedule.

9           I will issue a short order that says that the

10  plaintiffs will send me a letter in two weeks.

11           Let me also thank the court reporter.

12           And if anyone wants a copy of the transcript, can I

13  ask you to take that up with the court reporter's office later

14  because I have another matter now.

15

16                        o    0    o

17

18

19

20

21

22

23

24

25